1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ENVIRONMENTAL PROTECTION
INFORMATION CENTER, a non-profit corporation,

        Plaintiff,

        v.

PACIFIC LUMBER COMPANY, a Delaware
corporation; SCOTIA PACIFIC COMPANY LLC, a
Delaware corporation; ENVIRONMENTAL
PROTECTION AGENCY; and CHRISTINE TODD
WHITMAN,

        Defendants.

_____/

No. C 01-2821 MHP

**MEMORANDUM & ORDER**
**Parties' Cross-Motions for Summary**
**Judgment**

        On July 24, 2001 plaintiff Environmental Protection Information Center ("EPIC"), a non-profit environmental organization, brought a citizen-suit action under section 505(a) of the Clean Water Act ("CWA"), 33 U.S.C. section 1365(a), against Pacific Lumber Company and Scotia Pacific Lumber Company (collectively "PALCO"), the Environmental Protection Agency ("EPA"), and Christine Todd Whitman as EPA Administrator.[1]

        Now before the court are PALCO's motion for summary judgment regarding EPIC's first and second claims for relief[2] and EPIC's cross-motion for summary judgment on the issue of PALCO's liability.  The court has considered the parties' arguments fully, and for the reasons set forth below, the court rules as follows.

UNITED STATES DISTRICT COURT
For the Northern District of California

BACKGROUND

I.      Background Facts

        In each of its prior decisions the court has set forth the underlying facts of this action in significant detail, and it is not necessary to restate that background here in order to resolve the motions currently before the court.  The court, rather, need only reframe the core dispute.

        At the heart of this litigation is Bear Creek, a brook situated several miles upstream of Scotia, California.  A tributary of the Eel River, Bear Creek creates a watershed that covers 5500 acres of land throughout Humboldt County, California.  Pacific Lumber Company and its wholly-owned subsidiary, defendant Scotia Pacific Lumber Company, own some ninety-five percent of the land in the Bear Creek watershed, much of which PALCO uses for logging.[3]

        According to EPIC, substantial logging activity (primarily PALCO's) in the watershed area has spurred a dramatic increase in the amount of sediment deposited in Bear Creek.  Before significant logging began, EPIC claims, Bear Creek's sediment deposit peaked at approximately 8,000 tons per year; after logging practices commenced, sediment deposit climbed to 27,000 tons per year.  This sediment increase, EPIC alleges, has a specific source: PALCO's timber harvesting and construction of unpaved roads.  According to EPIC, PALCO's logging activity increases sediment through the following process.  First, EPIC notes, timber harvesting removes vegetation from the ground surface, making soil more susceptible to erosion and landslides.  Construction of unpaved roads then exposes more soil, which, in turn, further destabilizes slopes.  The effect of timber harvesting and road construction, EPIC contends, is to expose far more destabilized soil than is environmentally sustainable.  When it rains, EPIC explains, the rain water carries the exposed silts and sediments—as well as other pollutants, such as pesticides and diesel fuel—into culverts, ditches, erosion gullies, and other alleged channels.  From these various channels, silts, sediments and pollutants flow directly into Bear Creek.  The consequences of PALCO's drainage system, EPIC notes, are predictable and environmentally adverse; PALCO's present and future timber harvest plans, EPIC adds, promise only to make the situation worse.

2

UNITED STATES DISTRICT COURT
For the Northern District of California

1    EPIC believes PALCO's present drainage system violates various provisions of the Clean

2    Water Act, including (but not necessarily limited to) the National Pollutant Discharge Elimination

3    System ("NPDES").  See 33 U.S.C. §§ 1251(a), 1311(a), 1342(a); see also Environmental Def. Ctr.,

4    Inc. v. United States Envtl. Prot. Agency ("EPA"), 344 F.3d 832 (9th Cir. 2003), cert. denied, 541

5    U.S. 1085 (2004); Association to Protect Hammersley v. Taylor Res., Inc., 299 F.3d 1007, 1016 (9th

6    Cir. 2002) (noting that, in 1972, "Congress passed the Clean Water Act amendments, 33 U.S.C.

7    §§ 1251–1387, to respond to environmental degradation of the nation's waters."); Natural Resources

8    Defense Council ("NRDC") v. EPA, 822 F.2d 104, 109 (D.C. Cir. 1987) (citing 33 U.S.C.

9    § 1311(a)).  In substantial part, EPIC alleges that PALCO has used a variety of "point sources," see

10   33 U.S.C. § 1362(14), to discharge pollutants without first securing necessary NPDES permits.

11   Absent such permits, EPIC claims, PALCO's system conflicts with defendants' CWA obligations.

12

13   II.    Statutory and Regulatory Background

14       With the goal of "restor[ing] and maintain[ing] the chemical, physical, and biological

15   integrity of the Nation's waters," Congress enacted the CWA in 1972.  33 U.S.C. § 1251(a)

16   (originally codified as the Federal Water Pollution Control Act, 62 Stat. 1155); see Association to

17   Protect Hammersley, 299 F.3d at 1016; Pronsolino v. Nastri, 291 F.3d 1123, 1126 (9th Cir. 2002)

18   (observing that prior federal water pollution regulation "had proven ineffective"), cert. denied, 539

19   U.S. 926 (2003).  Built on a "fundamental premise" that the unauthorized "discharge of any

20   pollutant by any person shall be unlawful,'" NRDC v. EPA, 822 F.2d at 109 (citing 33 U.S.C. §

21   1311(a)), the CWA "establishes a comprehensive statutory system for controlling water pollution."

22   Association to Protect Hammersley, 299 F.3d at 1009 (citation and internal quotation marks

23   omitted).  This broad statutory scheme includes, inter alia, a National Pollutant Discharge

24   Elimination System (NPDES) for regulation of pollutant discharges into the waters of the United

25   States.  See 33 U.S.C. §§ 1311(a), 1342(a).  Under the NPDES, permits may be issued by EPA or by

26   States that have been authorized by EPA to act as NPDES permitting authorities.  See 33 U.S.C. §

27   1342(a)–(b); see also Environmental Def. Ctr., Inc., 344 F.3d at 841 (holding that pollution

28

3

1   dischargers must comply with "technology-based pollution limitations (generally according to the

2   'best available technology economically achievable,' or 'BAT' standard).")); NRDC v. EPA, 822

3   F.2d at 110 (noting that, when necessary, water quality-based standards may supplement technology

4   standards).  California has been so authorized.[4]

5          Not all pollutants or pollution sources fall within the purview of the NPDES.  Under the

6   CWA, "discharge of pollutant" is defined as "any addition of any pollutant to navigable waters from

7   any *point source*." 33 U.S.C. § 1362(12)(A) (emphasis added).  The CWA's and NPDES's focus,

8   then, trains largely on pollutant discharges from "point sources," a term the Act defines as:

9          any discernible, confined and discrete conveyance, including but not limited to any
           pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock,
10         concentrated animal feeding operation, or vessel or other floating craft, from which
           pollutants are or may be discharged.  This term does not include agricultural
11         stormwater discharges and return flows from irrigated agriculture.

12   Id.. at § 1362(14); see also id. at § 1362(6) (defining "pollutant" broadly to include substances

13   ranging from rock and sand to industrial, municipal, and industrial wastes).

14         The CWA distinguishes "point sources" from "nonpoint sources."  The NPDES

15   recognizes—and functions on the basis of—this distinction, requiring permits only for such "point

16   source" emissions.  See, e.g., League of Wilderness Defenders v. Forsgren, 309 F.3d 1181, 1183

17   (9th Cir. 2002) ("Point source pollution is distinguished from 'nonpoint source pollution,' which is

18   regulated in a different way and does not require [the NPDES] type of permit.").  Unlike "point

19   sources," "nonpoint sources"[5] are regulated indirectly: the CWA directs EPA to disseminate

20   information regarding nonpoint pollution sources, see 33 U.S.C. § 1314(f), but it is often through

21   state management programs that "nonpoint sources" are monitored and controlled.  See Oregon

22   Natural Desert Ass'n v. Dombeck, 172 F.3d 1092, 1096–97 (9th Cir. 1998), cert. denied, 528 U.S.

23   964 (1999).[6]

24

25   III.   Procedural History

26         In an effort to compel PALCO to comply with the putative terms of the CWA, EPIC brought

27   a citizen-suit action under section 505(a) of the CWA, 33 U.S.C. section 1365(a), against PALCO,

28

4

UNITED STATES DISTRICT COURT
For the Northern District of California

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1   the EPA, and then-EPA Administrator Christine Todd Whitman.  EPIC's first two claims allege,

2   generally stated, that PALCO's drainage system employs a number of unpermitted "point sources"

3   to discharge pollutants; EPIC later added a third claim, alleging that the adoption of a particular EPA

4   regulation—40 C.F.R. section 122.27—constituted an *ultra vires* act.  A number of potentially

5   dispositive motions followed.

6          On June 6, 2003 the court denied EPA's motion to dismiss and denied PALCO's motion to

7   dismiss in part, concluding that EPIC could pursue a claim under the Administrative Procedures Act

8   ("APA") in this court and that EPIC's claim was not time-barred.  On October 14, 2003 the court

9   denied EPIC's motion for summary adjudication on its third claim for relief, granting EPA's and

10  PALCO's cross-motions for summary adjudication and construing 40 C.F.R. section 122.27 to be

11  consistent with the governing provisions of the CWA.  On January 23, 2004 the court denied

12  PALCO's motion to dismiss EPIC's remaining claims (that is, its first and second claims for relief)

13  under Federal Rule of Civil Procedure 12(b)(6) and held that PALCO's "point sources"—to the

14  extent they exist—must comply with the terms of the NPDES and the CWA.  Further, on April 19,

15  2004 the court denied PALCO's motion to certify three of the court's decisions for interlocutory

16  review under 28 U.S.C. section 1292(b).

17         On July 12, 2005 PALCO filed a Notice of Intent ("NOI") to comply with the terms of the

18  General Permit to Discharge Storm Water Associated With Industrial Activity (WQ Order No. 97-

19  03-DWQ) ("Industrial General Permit" or "IGP") for PALCO's logging operations in the Bear

20  Creek Watershed.  Christopher J. Carr Dec., Exh. A at 2; see also Joint Statement of Undisputed

21  Facts in Support of PALCO's Motion for Summary Judgment (hereinafter "JSUF") at 3.  On the

22  same date, PALCO also filed a Storm Water Pollution Prevention Plan ("SWPPP"), which is a

23  document filed along with the NOI that outlines practices and procedures the applicant will

24  implement to reduce or prevent industrial pollutants in storm water discharges.  Carr Dec., Exh. C at

25  3; see also JSUF at 1.  PALCO submitted the NOI and SWPPP "solely in response" to the court's

26  previous decisions in this action.  Carr Dec., Exh. C at 11.  PALCO does not acknowledge the

27  "correctness of those orders" and it "reserves its right to, and will, challenge those orders through

28

5

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1  appellate review." Id. at 11–12.        On July 22, 2005 the State Water Resources Control Board

2  ("State Water Board") notified PALCO that it had received and processed PALCO's NOI.  Carr

3  Dec., Exh. B at 2.  The State Water Board informed PALCO that it must comply with the IGP

4  requirements unless and until it submits a Notice of Termination ("NOT") to the Regional Water

5  Board, which the Regional Water Board must then approve, stating that PALCO's facility no longer

6  needs coverage under the IGP.  Carr Dec., Exh. B at 2.

7        PALCO now urges the court to find that its procurement of the IGP has rendered EPIC's

8  claims moot.  In response, EPIC contends that PALCO, in procuring the IGP, has conceded its

9  liability under the CWA.

10

11  LEGAL STANDARD

12  I.        Summary Judgment

13        Summary judgment is proper when the pleadings, discovery, and affidavits show that there is

14  "no genuine issue as to any material fact and that the moving party is entitled to judgment as a

15  matter of law." Fed. R. Civ. P. 56(c).  Material facts are those which may affect the outcome of the

16  proceedings.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material

17  fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the

18  nonmoving party.  Id.  The party moving for summary judgment bears the burden of identifying

19  those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine

20  issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On an issue for which the

21  opposing party will have the burden of proof at trial, the moving party need only point out "that

22  there is an absence of evidence to support the nonmoving party's case."  Id.

23        Once the moving party meets its initial burden, the nonmoving party must go beyond the

24  pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a

25  genuine issue for trial." Fed. R. Civ. P. 56(e).  Mere allegations or denials do not defeat a moving

26  party's allegations.  Id.; see also Gasaway v. Northwestern Mut. Life Ins. Co., 26 F.3d 957, 960 (9th

27  Cir. 1994).  The court may not make credibility determinations, Anderson, 477 U.S. at 249, and

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1    inferences drawn from the facts must be viewed in the light most favorable to the party opposing the

2    motion.  Masson v. New Yorker Magazine, 501 U.S. 496, 520 (1991).

3

4    II.    Mootness

5         The jurisdiction of federal courts depends on the existence of a "case or controversy" under

6    Article III of the Constitution.  Liner v. Jafco, Inc., 375 U.S. 301, 306 n.3 (1964).  "[A] case is moot

7    when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the

8    outcome."  Demery v. Arpaio, 378 F.3d 1020, 1025 (9th Cir. 2004) (internal quotation marks

9    omitted) (quoting Powell v. McCormack, 395 U.S. 486, 496 (1969)), cert. denied, ___U.S.___, 125

10   S. Ct. 2961 (2005).  In considering whether an action is moot, the principal question to be asked is

11   whether the court can grant "any effective relief."  Blue Ocean Pres. Soc'y v. Watkins, 767 F. Supp.

12   1518, 1523 (D. Haw. 1991) (internal quotation marks omitted) (quoting Northwest Envtl. Def. Ctr.

13   v. Gordon, 849 F.2d 1241, 1245 (9th Cir. 1988)); see also Neighbors of Cuddy Mt. v. Alexander,

14   303 F.3d 1059, 1065 (9th Cir. 2002) (holding that "completion of activity is not the hallmark of

15   mootness.  Rather, a case is moot only where no effective relief for the alleged violation can be

16   given." (citing Cantrell v. City of Long Beach, 241 F.3d 674, 678 (9th Cir. 2001))).  A "party

17   moving for dismissal on mootness grounds [thus] bears a heavy burden."  Demery, 378 F.3d at 1025

18   (internal quotation marks omitted) (quoting Coral Constr. Co. v. King County, 941 F.2d 910, 927–28

19   (9th Cir. 1991), cert. denied, 502 U.S. 1033 (1992)).

20        In general, a defendant's voluntary cessation of a challenged practice "does not deprive a

21   federal court of its power to determine the legality of the practice."  Friends of the Earth, Inc. v.

22   Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 189 (2000) (internal quotation marks omitted) (quoting

23   City of Mesquite v. Aladdin's Castle, 455 U.S. 283, 289 (1982)).  Indeed, the Supreme Court has

24   recognized that "[i]f it did, the courts would be compelled to leave the defendant . . . free to return to

25   his old ways."  Id. (internal quotation marks omitted) (quoting City of Mesquite, 455 U.S. at 289

26   n.10).  Accordingly, a defendant's voluntary cessation of an allegedly unlawful activity does not

27   render a case moot unless the defendant meets the "heavy burden of persuading" the court that it is

28

7

UNITED STATES DISTRICT COURT
For the Northern District of California

1  "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."

2  See id. (internal quotation marks omitted) (quoting United States v. Concentrated Phosphate Export

3  Ass'n, Inc., 393 U.S. 199, 203 (1968)).  See also Anderson v. Evans, 371 F.3d 475, 479 (9th Cir.

4  2004); San Francisco Baykeeper, Inc. v. Tosco Corp., 309 F.3d 1153, 1160 (9th Cir. 2002), cert.

5  dismissed, 539 U.S. 924 (2003).  A party asserting mootness also can meet its burden by establishing

6  that "interim relief or events have completely and irrevocably eradicated the effects of the alleged

7  violation."  Norman-Bloodsaw v. Lawrence Berkeley Lab., 135 F.3d 1260, 1274 (9th Cir. 1998)

8  (internal quotation marks omitted) (quoting Lindquist v. Idaho State Bd. of Corr., 776 F.2d 851, 854

9  (9th Cir. 1985)).  The standard for assessing voluntary cessation is "stringent."  Laidlaw, 528 U.S. at

10  189.

11

12  DISCUSSION

13  I.      PALCO's Motion for Summary Judgment

14          PALCO contends that its decision to apply for and obtain a permit renders each of EPIC's

15  claims moot.  EPIC's first claim for relief is based on PALCO's discharging storm water into Bear

16  Creek without an NPDES permit.  See First Amended Complaint (hereinafter "FAC") ¶¶ 55–56.

17  EPIC's second claim for relief, similarly, is based on PALCO's failure to apply for and obtain an

18  NPDES permit for such alleged discharges.  See FAC ¶¶ 59–60.  PALCO contends that this action is

19  moot because the court cannot grant any effective relief to EPIC or its members.  In response, EPIC

20  contends that its claims are not moot because PALCO has not met its heavy burden of persuading

21  the court that it is absolutely clear that the challenged activity at Bear Creek will not recur.

22

23          A.      Burden to Prove Mootness

24          The parties are in disagreement over which side bears the burden of proving that this action

25  is moot.  PALCO asserts that this is a case where a regulatory agency's action—the issuance of the

26  IGP—has mooted EPIC's claims.  See Defs.' Mot. at 7.  PALCO thus submits that in order for this

27  court to retain jurisdiction, EPIC must prove that there is a realistic prospect that the challenged

28

8

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1   activity will continue notwithstanding the fact that PALCO has obtained the IGP.[7]  See Comfort

2   Lake Ass'n, Inc. v. Dresel Contracting, Inc., 138 F.3d 351, 355 (8th Cir.), reh'g denied, 1998 U.S.

3   App. LEXIS 8220 (8th Cir. 1998).  But see Mississippi River Revival, Inc. v. City of Minneapolis,

4   319 F.3d 1013, 1016–17 (8th Cir.) (holding defendants to heavy burden of establishing mootness

5   where defendants alleged that their procurement of NPDES permits rendered plaintiffs' CWA claims

6   moot), reh'g denied, 2003 U.S. App. LEXIS 6880 (8th Cir. 2003).  In opposition, EPIC contends

7   that PALCO's decision to obtain a permit should be analyzed under the voluntary cessation doctrine,

8   which requires PALCO to prove that the challenged activity cannot reasonably be expected to recur.

9   See, e.g., Laidlaw, 528 U.S. at 189.

10          Contrary to PALCO's assertion, even in cases where an agency's regulatory action may have

11  mooted a suit, the Ninth Circuit applies the standard that the party asserting mootness bears the

12  heavy burden of persuading the court that the case is moot.  See, e.g., Tinoqui-Chalola Council of

13  Kitanemuk & Yowlumne Tejon Indians v. United States DOE, 232 F.3d 1300, 1303–04 (9th Cir.

14  2000) (requiring the defendant to prove mootness where an agency's action may have rendered the

15  case moot).  Accord Communities for a Better Env't v. Tosco Refining Co., Inc,, 2001 U.S. Dist.

16  LEXIS 1161, at *13 (N.D. Cal. January 26, 2001) (Illston, J.) (holding that defendant carries the

17  heavy burden to prove mootness in a CWA case even where an agency's regulatory action may have

18  rendered the case moot).

19          Further, even assuming, *arguendo*, that Ninth Circuit law provides for shifting the burden of

20  proof in cases where an agency's regulatory action may have mooted a suit, the undisputed facts

21  establish that the action that has purportedly mooted EPIC's claims—PALCO's procurement of the

22  IGP—is attributable to PALCO's voluntary action in response to this lawsuit.  Indeed, PALCO

23  concedes that the motivating factor behind its decision to procure the IGP was its concern that it

24  would face civil penalties should liability be established in this action.  See Defs.' Reply at 4.  The

25  facts thus establish that PALCO voluntarily ceased the challenged activity by obtaining the IGP for

26  its Bear Creek operations.  See PUC v. FERC, 100 F.3d 1451, 1460 (9th Cir. 1996) (holding that "in

27  order for this exception to apply, the defendant's voluntary cessation must have arisen *because* of

28

the litigation."  (citing <u>Nome Eskimo Community v. Babbitt</u>, 67 F.3d 813, 816 (9th Cir. 1995)));

<u>Armster v. United States Dist. Court</u>, 806 F.2d 1347, 1357 (9th Cir. 1986) (holding that "[a] change

of activity by a defendant under the threat of judicial scrutiny is insufficient to negate the existence

of an otherwise ripe case or controversy [under the voluntary cessation exception to mootness]."

(citations omitted)).  Moreover, as discussed below, this conclusion is bolstered by the fact that the

regulatory agencies responsible for implementing the NPDES program—the Regional Board and the

State Board—played no role in PALCO's decision to obtain the permit.[8]  <u>See</u> JSUF at 9.

### B.    <u>Mootness Inquiry</u>

PALCO asserts that even if it bears the burden of proving that EPIC's claims are moot, the

court should grant its motion for summary judgment because it has demonstrated with absolute

certainty that it will not resume the allegedly illegal activity at Bear Creek.  PALCO rests its

argument on the assertion that "where the allegation is that of failure to obtain a permit, the

procurement of a permit is sufficient to demonstrate that it is 'absolutely clear' that the alleged

unlawful conduct will not recur."  Defs.' Mot. at 9.

PALCO relies on <u>Mississippi River Revival</u> for the proposition that where the gravamen of a

CWA plaintiff's claims is that a defendant has failed to obtain a permit for its discharges, the simple

procurement of the permit is enough to prove with absolute clarity that the allegedly unlawful

conduct will not recur.  <u>See</u> 319 F.3d at 1016–17.  Contrary to PALCO's assertion, the Eighth

Circuit did not hold that the bare fact that the defendants had procured NPDES permits was enough

to moot the plaintiffs' claims.  <u>See</u> <u>id.</u>  Rather, the court held that the plaintiffs' claims were moot

only after finding that the defendant cities had otherwise met their burden to prove that the

challenged activity could not reasonably be expected to recur.  <u>See</u> <u>id.</u> at 1016 (holding that "there

[was] no evidence that discharges without a permit [would] resume and overwhelming evidence to

the contrary.").  <u>See also</u> <u>Kennedy Bldg. Assocs. v. Viacom, Inc.</u>, 375 F.3d 731, 745–46 (8th Cir.)

(explaining that in <u>Mississippi River Revival</u>, the plaintiffs' claims were moot because "the

defendants were able to prove that it was absolutely clear that the allegedly wrongful behavior could

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

UNITED STATES DISTRICT COURT
For the Northern District of California

1   not reasonably be expected to recur." (internal quotation marks and citation omitted)), <u>reh'g denied</u>,

2   2004 U.S. App. LEXIS 17412 (8th Cir. 2004).  Accordingly, the court finds that PALCO's

3   procurement of the IGP—without more— is not sufficient to establish that PALCO will not resume

4   discharging without a permit in the future.

5          PALCO further argues that it has carried its burden to prove mootness because the

6   undisputed facts establish that there are "institutional controls" in place that check PALCO's ability

7   to independently resume the challenged conduct.  In support of its argument, PALCO emphasizes

8   that in order to terminate the IGP, it has to file a Notice of Termination (NOT) with the Regional

9   Board and must abide by the IGP's terms and conditions unless and until the Regional Board

10  approves the NOT.

11         IGP holders can seek to terminate their permits by submitting an NOT to their local Regional

12  Water Quality Control Board.  Defs.' Request for Judicial Notice (hereinafter "RJN"), Exh. 2 at 2.

13  The NOT form provides, *inter alia*, that a party may seek termination of its IGP if the party believes

14  that "[t]he facility is not required by federal regulations to be regulated by an industrial activities

15  storm water NPDES permit."  <u>Id.</u> at 3.  The Regional Board instructs that this basis of termination

16  may apply where "[a] facility operator who has filed a Notice of Intent for coverage under the

17  General Permit . . . later determines that the facility is not included in the identified categories . . . ."

18  <u>Id.</u> at 5–6.  "Submittal of a NOT does not guarantee termination . . . ."  <u>Id.</u> at 2.  Rather, the Regional

19  Board must review and approve the NOT in order to terminate a permit.  <u>See id.</u>

20         The NOT process does not supply meaningful protection in this case because the Regional

21  Board—the agency responsible for reviewing and approving an NOT—has clearly stated its position

22  that PALCO's silvicultural activities in Bear Creek do not require an NPDES permit.  <u>See</u> Michael

23  R. Lozeau Dec., Exh. G.  Likewise, the State Water Board has stated that "[i]n the absence of legal

24  authority establishing that such discharges should be regulated under the NPDES permit system, the

25  State Board concludes that the regional boards may continue to issue waivers for discharges

26  associated with timber harvesting . . . ."  State of California, State Water Resources Control Board

27  Order WQO 2004, "In the Matter of the Petition of Environmental Protection Information Center

28

11

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1    and Humboldt Watershed Council," 12–13 (Apr. 6, 2004), <u>at</u>

2    http://waterboards.ca.gov/agendas/2004/

3    April/0422-09.doc.  The State Board acknowledged this court's order of October 14, 2003, which

4    found that ditches, culverts and other manmade conveyances extant within silvicultural operations

5    cannot be removed wholesale from the CWA's point source classification, but determined that

6    because this matter "is not yet resolved," this court's interpretation "has no binding legal effect on

7    the resolution of the petitions before the State Board."  <u>Id.</u> at 13 n.15.

8        PALCO concedes that the Regional Board and the EPA, the agency to which the Regional

9    Board defers, have refused to acknowledge that silvicultural operations of the type PALCO performs

10    might require an NPDES permit despite this court's previous ruling to the contrary.  <u>See</u> Defs.'

11    Reply at 13; Lozeau Dec., Exh. G.  <u>See also</u> <u>Environmental Def. Ctr., Inc.</u>, 344 F.3d at 863

12    (remanding the case to the EPA "so that it may consider in an appropriate proceeding Petitioners'

13    contention that § 402(p)(6) requires EPA to regulate forest roads.").  In light of this undisputed fact,

14    PALCO's contention that its mootness argument should not be undermined by the fact that the

15    Regional Board "*may some day determine* that an NPDES permit is not necessary for PALCO's

16    operations," is disingenuous.  Defs.' Reply at 3 (emphasis added).  The Regional Board has already

17    made this determination.

18        PALCO also submits that because it has expended time, money and resources in securing and

19    maintaining coverage under the IGP, it therefore follows that "it is *highly unlikely* that PALCO

20    would abandon the NPDES program at some point more than five years from now (assuming EPIC

21    proves the requisite 'point source' discharge and the Ninth Circuit does not reverse certain of this

22    Court's orders)."  Defs.' Reply at 12 (emphasis added).  PALCO's self-serving statement falls far

23    short of satisfying its heavy burden to "assert[] []or demonstrate[] that [it] will *never resume*" the

24    challenged conduct of discharging storm water without a permit.  <u>See</u> <u>Norman-Bloodsaw</u>, 135 F.3d

25    at 1274 (emphasis added); <u>see also</u> <u>Concentrated Phosphate Export Ass'n</u>, 393 U.S. at 203 (holding

26    that "a statement, standing alone, cannot suffice to satisfy the heavy burden of persuasion which we

27    have held rests upon those [parties asserting mootness]." (citation omitted)).  Moreover, at oral

28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1   argument, PALCO conceded that if this court were to find the case moot, PALCO would likely file

2   an NOT with the Regional Board and would encourage the Board to grant the NOT.  It is not "highly

3   unlikely" that PALCO would abandon the NPDES program if this case were to become moot.

4          Finally, the court finds that PALCO's persistent representations that its Bear Creek

5   operations do not require an NPDES permit are an additional factor suggesting that there is a

6   likelihood that PALCO will resume the challenged activity.  See Blue Ocean Pres. Soc'y, 767 F.

7   Supp. at 1525 (holding that "the likelihood of recurrence of challenged activity is more substantial

8   when the cessation is not based upon a recognition of the initial illegality of that conduct." (citing

9   Walling v. Helmerich & Payne, Inc., 323 U.S. 37, 43 (1944))).  Indeed, PALCO, in the very

10  documents it submitted to obtain permit coverage, explicitly states that "[t]he preparation and

11  submission of these documents is not an admission that a Clean Water Act permit is required for

12  storm water discharges associated with PALCO's timber harvesting in the Bear Creek watershed."

13  Carr Dec., Exh. C at 12.  In the SWPPP, PALCO further states that

14

15          the preparation and submission of the SWPPP, Monitoring Program and Reporting
            Requirements, and any other documents and materials related to logging within the

16          Bear Creek watershed, and the submission of the NOI and any other documents
            required by this General Permit, is not an admission that PALCO is discharging

17          pollutants from a point source to a water of the United States.  These documents are
            submitted solely in response to the orders of the U.S. District Court for the Northern

18          District of California in *Environmental Protection Information Center v. Pacific
            Lumber Co.*, et al., Case No. C01-2821 MHP.

19
    Id. at 11.
20
           PALCO's mootness argument appears to be nothing more than a subterfuge to evade this
21
    court's April 19, 2004 order denying PALCO's motion to certify three of the court's previous
22
    decisions in this matter for interlocutory review.  In its moving papers, PALCO unabashedly
23
    represents that "if and when this Court's orders are reversed by the Ninth Circuit, PALCO will file
24
    an NOT and extricate itself from the IGP [Industrial General Permit] requirements."  Defs.' Reply at
25
    7.  PALCO's eagerness to appeal this court's orders belies it contention that the action is moot.
26
    Indeed, the court questions how PALCO could appeal the court's previous decisions in this matter if,
27

28
                                                    13

UNITED STATES DISTRICT COURT
For the Northern District of California

1  as PALCO asserts, the parties now lack a legally cognizable interest in the outcome of this action

2  and the issues between them are no longer live.  PALCO's position defies logic; an appellate court

3  would lack jurisdiction over a "review on the merits of [any] adverse collateral order[s]" issued by

4  this court prior to the case becoming moot, as there would no longer be an Article III case or

5  controversy.  Cf. Environmental Prot. Info. Ctr., Inc. v. Pacific Lumber Co., 257 F.3d 1071, 1076

6  (9th Cir. 2001) (noting that in general, a prevailing party cannot obtain appellate review on the

7  merits of an adverse collateral order that is entered before a case becomes moot), remanded to 229 F.

8  Supp. 2d 993 (N.D. Cal. 2002) (Patel, J.), aff'd, 103 Fed. Appx. 627 (9th Cir. 2004).  See also

9  Koppers Indus., Inc. v. United States EPA, 902 F.2d 756, 758 (9th Cir. 1990) (stating that the Ninth

10  Circuit "lacks jurisdiction to hear moot cases." (citing Bunker Ltd. P'ship v. United States, 820 F.2d

11  308, 310 (9th Cir. 1987))).  This court will not countenance PALCO's thinly-veiled, and mistaken,

12  attempt to bypass the proper channels of review.  If PALCO wishes to challenge the court's

13  decisions in this matter, it may do so after EPIC's claims have proceeded to a final decision on the

14  merits.

15  Based on the foregoing, the court concludes that PALCO has failed to meet its burden to

16  prove that the alleged violations underlying this lawsuit are unlikely to recur.

17

18  C.    Effective Relief

19  PALCO further argues that EPIC's claims are moot because the court cannot grant any

20  effective relief to EPIC or its members.  See San Francisco Baykeeper, 309 F.3d at 1159 (holding

21  that "[t]o establish mootness, a defendant must show that the court cannot order any effective relief."

22  (citations omitted)).  Contrary to PALCO's assertion, the court finds that at the very least, EPIC's

23  claim for civil penalties would remain viable if it were to prevail on the merits of its claims.[9]

24  If a court finds that a defendant has violated the CWA, the court may award payment of "a

25  civil penalty not to exceed $25,000 per day for each violation."  33 U.S.C. § 1319(d).  "If civil

26  penalties are awarded in citizen suits, they are payable not to the citizen plaintiff but to the U.S.

27  Treasury."  San Francisco Baykeeper, 309 F.3d at 1156 (citations omitted).  In citizen suits, the

28

14

UNITED STATES DISTRICT COURT
For the Northern District of California

1   imposition of civil penalties serves to "deter future violations of the Clean Water Act even when

2   injunctive relief is inappropriate." Ecological Rights Found. v. Pacific Lumber Co., 230 F.3d 1141,

3   1153 (9th Cir. 2000) (citation omitted).

4       PALCO argues that EPIC's claim for civil penalties is moot because there is no evidence that

5   PALCO will resume the allegedly unlawful behavior—operating without a permit—in the future.

6   PALCO further asserts that the need for deterrence in the form of civil penalties is absent in the

7   present action because PALCO cannot unilaterally terminate the IGP. Because PALCO has failed to

8   meet its burden to prove that the allegedly unlawful activity cannot reasonably be expected to recur,

9   it also has failed to establish that its procurement of the IGP has rendered EPIC's claim for civil

10  penalties moot. See San Francisco Baykeeper, 309 F.3d at 1160 (holding that "[o]nly when it is

11  absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur will

12  events following the commencement of a suit moot a claim for civil penalties." (internal quotation

13  marks and citation omitted)).

14      Additionally, the court notes that liability for civil penalties, which attaches at the time of the

15  violation, serves an important deterrent function, especially where a party found to have violated the

16  CWA continues to engage in the operations that gave rise to the violations. See Laidlaw, 528 U.S. at

17  174; Ecological Rights Found., 230 F.3d at 1153 (holding that a claim for civil penalties was not

18  moot despite the fact that defendant operated its facilities under a new, stricter CWA permit because

19  "[t]here [was] no basis for believing that the bare fact of a new, stricter permit makes future permit

20  violations any less likely, deterrence any less necessary, or the deterrent effect of civil penalties any

21  less potent."). See also San Francisco Baykeeper, 309 F.3d at 1160 (holding that plaintiff's claim

22  for civil penalties was not moot even though defendant firm sold the polluting facility at issue

23  because the "facility is still operating, and there is a possibility that violations will recur at the

24  facility."). In the present action, PALCO continues to engage in its silvicultural operations in Bear

25  Creek. Despite PALCO's assertion that the need for deterrence is absent here because of

26  "institutional controls" that check its ability to resume the challenged activity, the court finds that if

27

28

1    EPIC were to prevail on the merits, the imposition of civil penalties could serve as a powerful

2    deterrent.

3         PALCO's motion for summary judgment is therefore denied.

4

5    III.    EPIC's Cross-Motion for Partial Summary Judgment

6         EPIC argues that this court should grant its motion for partial summary judgment because

7    PALCO, as a consequence of seeking coverage under the Industrial General Permit (IGP), has

8    conceded that it has made unpermitted discharges of storm water associated with an industrial

9    activity from a point source into waters of the United States in violation of the CWA.  EPIC

10   contends that PALCO's admissions of liability obviate the need for EPIC to produce factual

11   evidence establishing PALCO's alleged point source discharges.  In response, PALCO asserts that

12   the documents it filed to obtain permit coverage cannot be construed as conclusive admissions for

13   purposes of establishing its liability under the CWA, and argues that summary judgment is

14   inappropriate because EPIC has failed to produce evidence that PALCO has discharged storm water

15   or pollutants from a point source into Bear Creek.

16

17        A.      Elements of a *Prima Facie* Case Under the CWA

18        EPIC concedes that to establish a defendant's liability under the CWA, a plaintiff must

19   establish that the defendant (1) discharged (2) a pollutant (3) from a point source (4) to waters of the

20   United States.  See Headwaters, Inc. v. Talent Irrigation Dist., 243 F.3d 526, 532 (9th Cir. 2001)

21   (citation omitted).  However, EPIC contends that it does not have to make this showing here because

22   PALCO has already conceded all of the factual elements necessary for EPIC to meet its burden to

23   prove PALCO's liability under the CWA.  EPIC argues that the Notice of Intent (NOI) and Storm

24   Water Pollution Prevention Plan (SWPPP) PALCO filed with the State Water Board constitute

25   conclusive evidence that PALCO operates a "facility" under the permit.[10]  EPIC contends that by

26   acknowledging that it operates a "facility," PALCO also acknowledges, by definition, that it

27   operates "conveyances," the "*sine que* [sic] *non* of a point source under the CWA," and discharges

28

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1   storm water associated with industrial activity[11] to Bear Creek.[12]  Pl.'s Mot. at 10.  Under Ninth

2   Circuit law, because EPIC asserts that PALCO's statements in the NOI and SWPPP are admissions

3   of PALCO's liability, EPIC has not offered any independent factual evidence establishing that

4   PALCO has discharged storm water associated with an industrial activity or pollutants from an

5   identified point source into Bear Creek in violation of the CWA.

6       EPIC cites no authority for the proposition that documents—NOIs and SWPPPs—submitted

7   to obtain permit coverage may be relied upon as conclusive admissions of a defendant's liability

8   under the CWA.  Rather, EPIC relies on a series of cases holding that under the CWA publicly filed

9   reports such as Discharge Monitoring Reports ("DMRs") serve as conclusive evidence of a

10  permittee's liability in enforcement actions, and asks the court to find these reports analogous to the

11  documents—the NOI and SWPPP—that PALCO submitted to initiate coverage under the IGP.  See,

12  e.g., Sierra Club v. Union Oil Co., 813 F.2d 1480, 1491–92 (9th Cir. 1987) (holding that required

13  self-monitoring reports constitute conclusive evidence of an exceedance of an NPDES permit

14  limitation), vacated on other grounds by 485 U.S. 931 (1988); United States v. CPS Chem. Co., 779

15  F. Supp. 437, 442 (D. Ark. 1991) (stating that "[f]or enforcement purposes, a permittee's DMRs

16  constitute admissions regarding the levels of effluents that the permittee has discharged." (citation

17  omitted)); Student Pub. Interest Research Group, Inc. v. Fritzsche, Dodge & Olcott, Inc., 579 F.

18  Supp. 1528, 1538 (D.N.J. 1984) (holding that "reports or records which are required to be kept by

19  law, such as DMR's and NCR's, may be used as admissions to establish a defendant's liability."

20  (citation omitted)), aff'd 759 F.2d 1131 (3d Cir. 1985); Save Our Bays and Beaches v. City and

21  County of Honolulu, 904 F. Supp. 1098, 1138 (D. Haw. 1994) (holding that a city's noncompliance

22  reports which it submitted pursuant to the CWA "constitute admissions of noncompliance which

23  bind the defendant in this [enforcement] proceeding.").

24      EPIC's argument fails initially because NOIs and SWPPPs are wholly distinguishable from

25  DMRs.  Although NOIs and SWPPPs, like DMRs, are certified as true under penalty of perjury, the

26  similarities end there.  DMRs are reports, submitted by NPDES permittees, that establish the levels

27  of the permittees' past discharges of pollutants.  See Union Oil, 813 F.2d at 1491–92.  Significantly,

28

17

UNITED STATES DISTRICT COURT
For the Northern District of California

1   in each of the cases EPIC cites, there was undisputed evidence that defendants had discharged

2   pollutants from a point source, and the only issue was whether they failed to comply with the

3   limitations in their NPDES permits.  See, e.g., id. at 1484 (stating that the parties did not dispute that

4   "Union Oil operates a facility that discharges treated wastewater into the San Pablo Bay . . . ."); see

5   also CPS Chem. Co., Inc., 779 F. Supp. at 443 (stating that "[t]he facts necessary to support a

6   finding of liability in this case are not in dispute.").  In such cases, it is reasonable to preclude a

7   permittee from impeaching its own DMRs during an enforcement proceeding because the "NPDES

8   program fundamentally relies on self-monitoring," and "allowing permittees to excuse their reported

9   exceedances by showing sampling error would create the perverse result of rewarding permittees for

10  sloppy laboratory practices."  Union Oil, 813 F.2d at 1492.  In contrast to DMRs, NOIs "do not

11  establish that any discharge has actually occurred [into navigable waters] . . . ."  Texas Indep.

12  Producers and Royalty Owners Assoc. v. Environmental Prot. Agency, 410 F.3d 964, 973 (7th Cir.)

13  (holding that plaintiffs could not discharge their burden to meet the CWA's standing requirements

14  by relying on defendant's Notice of Intent to discharge pollutants under the terms of the General

15  Permit), reh'g denied, 2005 U.S. App. LEXIS 18825 (7th Cir. 2005).  Similarly, a SWPPP is merely

16  a "[d]ocument that contains practices and procedures that are designed in order to reduce or prevent

17  industrial pollutants in storm water discharges."  Carr Dec., Exh. C at 9.  Unlike DMRs, SWPPPs do

18  not explicitly address a permittee's past discharges of pollutants but rather detail those practices a

19  permitee will use to prevent such discharges.  See id.

20        Contrary to EPIC's assertion, the court finds that it would be illogical to impose a rule

21  holding a party conclusively liable for unpermitted point source discharges on the sole basis of

22  statements it made in documents submitted to obtain permit coverage.  Consequently, the court finds

23  that the NOI and SWPPP do not serve as conclusive evidence that PALCO has discharged storm

24  water and pollutants from a point source into Bear Creek.  See Environmental Def. Ctr., Inc., 344

25  F.3d at 853 (stating that an "NOI represents no more than a formal acceptance of terms elaborated

26  [in the CWA] . . . .").  Thus, as an evidentiary matter, EPIC cannot submit PALCO's enrollment

27  documents in lieu of other factual evidence establishing that PALCO discharged storm water

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1   associated with industrial activity or pollutants from a point source into Bear Creek.  See Bufford v.

2   Williams, 42 Fed. Appx. 279, 284 n.3 (10th Cir. 2002) (holding that "to establish a violation of the

3   Clean Water Act it is . . . necessary to put forth evidence of a point-source discharge of pollutants in

4   the first instance.").

5          This holding comports with the only case this court has found in which a plaintiff offered a

6   defendant's NPDES permit application as evidence of a defendant's liability under the CWA.  See

7   Ohio Envtl. Council v. VARI-SEAL Mfg. Corp., 32 Env't Rep. Cas. (BNA) 1679 (N.D. Ohio 1990).

8   In VARI-SEAL Manufacturing, the plaintiff submitted the defendant's NPDES permit application in

9   support of its contention that the defendant discharged pollutants into navigable waters.  The

10  defendant's permit application required the defendant to answer the following question: "[i]s this a

11  facility which currently results in discharges to waters of the U.S.?"  Id.  The defendant answered

12  this question in the affirmative.  Although the court did not explicitly state what weight, if any, it

13  afforded this piece of evidence, it is significant that the plaintiff also submitted other undisputed

14  evidence, in the form of affidavits, that conclusively established that the defendant discharged

15  pollutants from a discrete point source into navigable waters.  Id.  In contrast, in the instant matter,

16  EPIC has proffered no evidence, aside from PALCO's permit enrollment documents, that establishes

17  that PALCO has discharged pollutants or storm water from a discrete point source into Bear Creek.

18         Further, even viewing the statements in the NOI and SWPPP as admissions with some

19  evidentiary value, the court finds that the admissions made in those documents do not establish that

20  PALCO has discharged storm water or pollutants from a *point source* into Bear Creek.  Neither the

21  NOI nor the SWPPP submitted by PALCO identifies any discrete point sources on PALCO's Bear

22  Creek property from which storm water or pollutants are discharged into Bear Creek.  Aside from

23  PALCO's general statement in the SWPPP that "[r]oads can be a major source of sediment input to

24  streams, especially where they cross watercourses and when they are used during wet weather," Carr

25  Dec., Exh. C at 24, there are no specific statements in either document establishing that PALCO

26  operates point sources such as culverts, ditches or conduits from which storm water or pollutants are

27  discharged into Bear Creek.  EPIC simply piles inference upon inference, asserting that because

28

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1 PALCO, in its IGP enrollment documents, stated that it operates a "facility," it must therefore

2 follow, by definition, that PALCO discharges storm water associated with industrial activity from

3 "conveyances," which are used for collecting and conveying storm water.  However, EPIC has not

4 proffered factual evidence of a single point source on PALCO's property.

5      Although as a general matter, a "facility" permitted under the IGP is defined as "a collection

6 of industrial processes discharging storm water associated with industrial activity within the

7 property or operational unit, " Defs.' RJN, Exh. 1 at 78, the court holds that EPIC must still put forth

8 actual proof that PALCO has made unpermitted discharges from a discrete point source into Bear

9 Creek.  This holding comports with the fact that the CWA only imposes liability for unpermitted

10 point source discharges.  League of Wilderness Defenders, 309 F.3d at 1183.  Therefore, the IGP

11 obtained by PALCO only regulates point sources—to the extent they exist—from which discharges

12 are made into Bear Creek; the IGP does not regulate any non-point source discharges.  Even

13 assuming, *arguendo*, that EPIC had established that PALCO made discharges from its Bear Creek

14 operations, it would still be improper to impose liability on PALCO without proof of specific

15 unpermitted point source discharges because it is impossible to discern from the record whether the

16 alleged discharges occurred via point sources or nonpoint sources.  Cf. Idaho v. Hanna Mining Co.,

17 699 F. Supp. 827, 832 (D. Idaho 1987) (holding that it would be inappropriate to impose liability on

18 defendants where the factual record was insufficient to establish whether the damages caused by

19 defendants' operations were due to point source discharges, which were regulated under defendants'

20 NPDES permit, or non-point discharges), aff'd, 882 F.2d 392 (9th Cir. 1989).  Cf. also Sierra Club v.

21 Abston Constr. Co., 620 F.2d 41, 47 (5th Cir. 1980) (holding that summary judgment was

22 inappropriate where additional findings of fact were necessary to determine whether defendants'

23 discharges occurred via point sources or nonpoint sources).  Consequently, the court finds that EPIC

24 has failed to meet its initial burden to show that PALCO has discharged from a point source.

25 Summary judgment as to PALCO's liability under the CWA is therefore inappropriate.

26      EPIC also argues that because PALCO "opted to enroll in a NPDES permit," it is now barred

27 from challenging the terms of that permit in this court.  Pl.'s Reply at 7.  As an initial matter, the

28

UNITED STATES DISTRICT COURT
For the Northern District of California

court is unable to determine from EPIC's papers how PALCO's ability to challenge the language of the IGP has any bearing on the instant motions. There is nothing in the language of the 1997 IGP that establishes that PALCO has made unpermitted discharges in violation of the NPDES and CWA requirements. In addition, as just discussed, the permit does not suffice to satisfy EPIC's burden as the party seeking summary judgment. The court need not rule on the legal merits of EPIC's claim.

EPIC's motion for summary judgment is therefore denied.

## B. PALCO's Evidentiary Proffer

In opposing EPIC's motion, PALCO has submitted expert declarations that appear to include legal conclusions as to the applicability of the CWA to PALCO's Bear Creek operations. For example, Dr. Pyles opines that "[o]verlaying a point source regulatory regime on PALCO's Bear Creek lands runs counter to the common understanding of non-point source management in the field of forest engineering and would be impractical and ineffectual in addressing polluted storm water runoff." Marvin R. Pyles Dec. ¶ 24. Likewise, Dr. Beschta concludes that "[f]rom a practical perspective, trying to accurately identify *a priori* which road drainage structures deliver water and sediment to a channel for possible point source permitting would seemingly represent a nearly impossible task." Robert L. Beschta Dec. ¶ 38. PALCO points out that the field observations and conclusions of Drs. Beschta and Pyles support the EPA's determination that storm water runoff from forest roads and their associated drainage features are exempted from the NPDES permitting requirements.

The court reminds PALCO that despite its stubborn protestations to the contrary, this court has already settled the issue of whether PALCO's silvicultural operations might be subject to the provisions of the NPDES and the CWA. Indeed, the court's January 23, 2004 order provides that PALCO's point sources—to the extent they exist—must comply with the terms of the NPDES and the CWA. Environmental Prot. Info. Ctr. v. Pacific Lumber Co., 301 F. Supp. 2d 1102, 1113 (N.D. Cal. 2004) (Patel, J.). Although PALCO has repeatedly stated that it disagrees with the court's interpretation of 40 C.F.R. section 122.7 and that it intends to appeal certain of the court's decisions

1    in this matter, PALCO simply cannot relitigate the issue of whether its silvicultural operations are

2    *per se* exempted from the operation of the NPDES and CWA at this stage of the litigation. See

3    United States v. Phillips, 367 F.3d 846, 856 (9th Cir.) (stating that "[t]he law of the case doctrine

4    precludes a court from reconsidering an issue that it has already resolved."), cert. denied, 543 U.S.

5    980 (2004).  Therefore, PALCO's argument that "storm water runoff from forest roads and their

6    associated BMP drainage features cannot be practically and effectually regulated by NPDES

7    permitting" is irrelevant to the present motion.  Defs.' Opp'n at 23.  Moreover, the court finds

8    PALCO's suggestion that the court defer to the EPA's interpretation of 40 C.F.R. section 122.7

9    absurd, as this court has explicitly held in its previous decisions that the EPA has misinterpreted this

10   regulation.  See, e.g., Environmental Prot. Info. Ctr., 301 F. Supp. 2d at 1112 n.8 (stating that "[t]o

11   the extent that the alleged 'point sources' on or near Bear Creek were previously 'unregulated,' they

12   were only so because of PALCO's—and EPA's—misinterpretation of section 122.27.").

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONCLUSION

For the foregoing reasons, the court hereby DENIES defendants' motion for summary judgment with respect to plaintiff's first and second claims for relief and DENIES plaintiff's cross-motion for partial summary judgment on the issue of defendants' liability.

In anticipation of further dispositive motions, the court requests additional briefing on the issue of what plaintiff must prove in order to establish defendants' liability under the CWA. More specifically, it is not clear from the record whether, as a consequence of defendants' procurement of the Industrial General Permit (IGP), plaintiff must prove that defendants (1) discharged (2) storm water associated with industrial activity (3) from a point source (4) into waters of the United States (5) without a permit, or whether plaintiff must instead prove that defendants (1) discharged (2) a pollutant (3) from a point source (4) to waters of the United States (5) without a permit. The court asks the parties to clarify this liability issue because they appear to now take positions inconsistent with their previous litigation positions in this matter. See Environmental Prot. Info. Ctr., 301 F. Supp. 2d at 1111–12. Indeed, EPIC's complaint alleges that PALCO's Bear Creek drainage system employs a number of point sources to redirect storm water and pollutants (i.e., something not "composed entirely of storm water") into Bear Creek. Id. at 1111. However, EPIC now asserts that it does not have to show that PALCO made unpermitted discharges of pollutants to carry its burden under the CWA. Likewise, PALCO also appears to have changed its position with respect to the issue of its potential liability in this matter. Although PALCO has opted to enroll its operations under the Industrial General Permit (IGP) for storm water discharges, PALCO previously claimed that its Bear Creek operations do not include storm water discharge sources associated with an "industrial" activity. Id. The parties are also asked to address what types of evidence plaintiff would have to proffer in order to carry its burden to prove defendants' liability under the CWA. Plaintiff shall file within ten (10) days of the date of this order a brief not to exceed 10 pages addressing these

UNITED STATES DISTRICT COURT
For the Northern District of California

1    issues.  Ten (10) days thereafter defendants shall respond also in a brief not to exceed 10 pages.

2    There will be no reply briefs.

3

4

5

6            IT IS SO ORDERED.

7

8

9    Dated: April 28, 2006

10                                                    _____
                                                     MARILYN HALL PATEL
11                                                   District Judge
                                                     United States District Court
12                                                   Northern District of California

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                              24

**ENDNOTES**

1.  Pursuant to Federal Rule of Civil Procedure 25(d)(1), Michael Leavitt, new Administrator of EPA, automatically replaces his predecessor in this suit.  See Fed. R. Civ. P. 25(d)(1).

2.  Pursuant to the parties' stipulation, PALCO's motion for summary judgment as to EPIC's claims alleging violations of the California Unfair Competition Law is stayed pending a final decision by the California Supreme Court on its review of cases concerning the question of whether the terms of Proposition 64 apply to cases pending at the time Proposition 64 became law.

3.  Both Pacific Lumber and Scotia Pacific Lumber Company are Delaware corporations; both maintain principal places of business in Scotia, California.

4.  The EPA delegated its permit-issuing authority to California on May 14, 1973.  See 39 Fed. Reg. 26,061 (July 16, 1974).  California administers its portion of the NPDES program through the Porter-Cologne Water Quality Control Act ("Porter-Cologne Act"), Cal. Water Code § 13000 et seq., which, in turn, created a group of Regional Water Quality Control Boards charged with the responsibility of issuing Waste Discharge Requirements ("WDRs").  By every relevant measure, WDRs are equivalent to CWA permits, and in every relevant sense for this action, the Porter-Cologne Act imports its definitions from the CWA, including those for "pollutants," "discharge," and "point source."  See Cal. Water Code § 13373.

5.  As the Ninth Circuit has noted, "nonpoint source pollution is not statutorily defined."  League of Wilderness Defenders, 309 F.3d at 1184.  As the Ninth Circuit has also noted, "nonpoint source pollution . . . is widely understood to be the type of pollution that arises from many dispersed activities over large areas . . . not traceable to any single discrete source."  Id.  The paradigmatic example of nonpoint source pollution, the Ninth Circuit adds, is automobile residue—whether rubber, metal, oil, or gas—left on the roadways.  Id.

6.  The CWA's distinct approach to regulation of "nonpoint sources" should not be seen as an indication that "nonpoint sources" constitute an insignificant source of pollution.  In fact, quite the opposite is true.  As the Ninth Circuit recently observed, nonpoint source pollution from automobile use itself outstrips point source pollution from chemical spills, factories, and sewage plants; indeed, nonpoint source pollution from automobile use is the largest source of water pollution in the United States.  See League of Wilderness Defenders, 309 F.3d at 1184 (citation omitted).

7.  PALCO cites to Russian River Watershed Prot. Comm. v. Santa Rosa, 142 F.3d 1136, 1143 (9th Cir. 1998), for this proposition.  PALCO's reliance on this case is mistaken.  In Russian River Watershed, the Ninth Circuit found that appellants lacked standing under the CWA because they "did not prove the existence of ongoing violations or the reasonable likelihood of continuing future violations."  Id.  However, the Ninth Circuit's holding on the issue of standing does not guide this court's determination of mootness.  See Laidlaw, 528 U.S. at 191–92 (distinguishing the doctrine of standing from the doctrine of mootness).  Cf. San Francisco Baykeeper, Inc. v. Moore, 180 F. Supp. 2d 1116, 1123 (E.D. Cal. 2001) (holding that it is inappropriate to apply the voluntary cessation

exception to a determination of standing under the CWA, given that mootness and standing are two wholly separate jurisdictional doctrines).

8. For the same reason, PALCO's contention that the voluntary cessation exception does not apply because PALCO cannot unilaterally resume the challenged activity, even if true, would be irrelevant given the facts of this case.

9. PALCO also asserts that EPIC's claims for injunctive and declaratory relief are moot. The court will revisit the nature and extent of appropriate declaratory and injunctive relief during the remedies phase of the lawsuit.

10. In the NOI filed on July 12, 2005, PALCO identified its "facility" as "Bear Creek Watershed." Carr Dec., Exh. A at 4. Section VI of the NOI requires an applicant to provide information about the waters into which a facility's storm waters flow. The NOI contains the following statement: "Your facility's storm water discharges flow: (check one) [ ] Directly OR [ ] Indirectly to waters of the United States." Id. PALCO checked the box labeled "directly," and identified the name of the receiving water as "Bear Creek." Id.

11. EPIC asserts that to establish a violation of the CWA permitting requirements for industrial storm water discharges, EPIC must show that PALCO (1) discharged storm water (2) to navigable waters (3) from a point source. Pl.'s Mot. at 5. EPIC cites Natural Resources Defense Council v. EPA, 966 F.2d 1292, 1304 (9th Cir. 1992), for the proposition that "[i]t is not necessary that storm water be contaminated or come into direct contact with pollutants: only association with any type of industrial activity is necessary." EPIC's reliance on this theory of liability raises other issues, which are addressed infra in the concluding section of this order.

12. The Industrial General Permit (IGP) defines a "facility" as "a collection of industrial processes discharging storm water associated with industrial activity within the property or operational unit." Defs.' RJN, Exh. 1 at 78. The IGP defines "storm water associated with industrial activity" as "the discharge from any conveyance which is used for collecting and conveying storm water and which is directly related to manufacturing, processing, or raw materials storage areas at an industrial plant. The term does not include discharges from facilities or activities excluded from the NPDES program." Id. at 79.

26