1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ENVIRONMENTAL PROTECTION
INFORMATION CENTER, a non-profit corporation,

        Plaintiff,

        v.

PACIFIC LUMBER COMPANY, a Delaware
corporation; SCOTIA PACIFIC COMPANY LLC, a
Delaware corporation; ENVIRONMENTAL
PROTECTION AGENCY; and CHRISTINE TODD
WHITMAN,

        Defendants.

                                  /

No. C 01-2821 MHP

**MEMORANDUM & ORDER**
**Re: Parties' Cross-Motions for**
**Summary Judgment**

      On July 24, 2001 plaintiff Environmental Protection Information Center ("EPIC"), a

non-profit environmental organization, brought a citizen-suit action under section 505(a) of the

Clean Water Act ("CWA"), 33 U.S.C. section 1365(a), against Pacific Lumber Company and Scotia

Pacific Company (collectively "PALCO"), the Environmental Protection Agency ("EPA"), and

Christine Todd Whitman as EPA Administrator.[1]

      Now before the court are PALCO's motion for summary judgment on the issue of EPIC's

standing and EPIC's motion for partial summary judgment regarding its first and second claims for

relief.[2]  The court has considered the parties' arguments fully, and for the reasons set forth below,

the court rules as follows.

BACKGROUND

I.      Background Facts

In each of its prior decisions the court has set forth the underlying facts of this action in significant detail, and it is not necessary to restate that background here in order to resolve the motions currently before the court. The court, rather, need only reframe the core dispute.

At the heart of this litigation is Bear Creek, a brook situated several miles upstream of Scotia, California. A tributary of the Eel River, Bear Creek creates a watershed that covers 5500 acres of land throughout Humboldt County, California. Pacific Lumber Company and its wholly-owned subsidiary, defendant Scotia Pacific Lumber Company, own some ninety-five percent of the land in the Bear Creek watershed, much of which PALCO uses for logging.[3]

According to EPIC, substantial logging activity (primarily PALCO's) in the watershed area has spurred a dramatic increase in the amount of sediment deposited in Bear Creek. Before significant logging began, EPIC claims, Bear Creek's sediment deposit peaked at approximately 8,000 tons per year; after logging practices commenced, sediment deposit climbed to 27,000 tons per year. This sediment increase, EPIC alleges, has a specific source: PALCO's timber harvesting and construction of unpaved roads. According to EPIC, PALCO's logging activity increases sediment through the following process. First, EPIC notes, timber harvesting removes vegetation from the ground surface, making soil more susceptible to erosion and landslides. Construction of unpaved roads then exposes more soil, which, in turn, further destabilizes slopes. The effect of timber harvesting and road construction, EPIC contends, is to expose far more destabilized soil than is environmentally sustainable. When it rains, EPIC explains, the rain water carries the exposed silts and sediments—as well as other pollutants, such as pesticides and diesel fuel—into culverts, ditches, erosion gullies, and other alleged channels. From these various channels, silts, sediments and pollutants flow directly into Bear Creek. The consequences of PALCO's drainage system, EPIC notes, are predictable and environmentally adverse; PALCO's present and future timber harvest plans, EPIC adds, promise only to make the situation worse.

UNITED STATES DISTRICT COURT
For the Northern District of California

1   EPIC believes PALCO's present drainage system violates various provisions of the Clean

2   Water Act, including (but not necessarily limited to) the National Pollutant Discharge Elimination

3   System ("NPDES").  See 33 U.S.C. §§ 1251(a), 1311(a), 1342(a); see also Environmental Def. Ctr.,

4   Inc. v. United States Envtl. Prot. Agency ("EPA"), 344 F.3d 832 (9th Cir. 2003), cert. denied, 541

5   U.S. 1085 (2004); Association to Protect Hammersley v. Taylor Res., Inc., 299 F.3d 1007, 1016 (9th

6   Cir. 2002) (noting that, in 1972, "Congress passed the Clean Water Act amendments, 33 U.S.C.

7   §§ 1251–1387, to respond to environmental degradation of the nation's waters."); Natural Resources

8   Def. Council ("NRDC") v. EPA, 822 F.2d 104, 109 (D.C. Cir. 1987) (citing 33 U.S.C. § 1311(a)).

9   In substantial part, EPIC alleges that PALCO has used a variety of "point sources," see 33 U.S.C. §

10  1362(14), to discharge pollutants without first securing necessary NPDES permits.  Absent such

11  permits, EPIC claims, PALCO's system conflicts with defendants' CWA obligations.

12

13  II.   Statutory and Regulatory Background

14   With the goal of "restor[ing] and maintain[ing] the chemical, physical, and biological

15  integrity of the Nation's waters," Congress enacted the CWA in 1972.  33 U.S.C. § 1251(a)

16  (originally codified as the Federal Water Pollution Control Act, 62 Stat. 1155); see Association to

17  Protect Hammersley, 299 F.3d at 1016; Pronsolino v. Nastri, 291 F.3d 1123, 1126 (9th Cir. 2002)

18  (observing that prior federal water pollution regulation "had proven ineffective"), cert. denied, 539

19  U.S. 926 (2003).  Built on a "fundamental premise" that the unauthorized "discharge of any

20  pollutant by any person shall be unlawful," NRDC v. EPA, 822 F.2d at 109 (citing 33 U.S.C. §

21  1311(a)), the CWA "establishes a comprehensive statutory system for controlling water pollution."

22  Association to Protect Hammersley, 299 F.3d at 1009 (citation and internal quotation marks

23  omitted).  This broad statutory scheme includes, inter alia, a National Pollutant Discharge

24  Elimination System (NPDES) for regulation of pollutant discharges into the waters of the United

25  States.  See 33 U.S.C. §§ 1311(a), 1342(a).  Under the NPDES, permits may be issued by EPA or by

26  states that have been authorized by EPA to act as NPDES permitting authorities.  See 33 U.S.C. §

27  1342(a)–(b); see also Environmental Def. Ctr., Inc., 344 F.3d at 841 (holding that pollution

28

UNITED STATES DISTRICT COURT
For the Northern District of California

3

UNITED STATES DISTRICT COURT
For the Northern District of California

dischargers must comply with "technology-based pollution limitations (generally according to the 'best available technology economically achievable,' or 'BAT' standard)."); NRDC v. EPA, 822 F.2d at 110 (noting that, when necessary, water quality-based standards may supplement technology standards). California has been so authorized.[4]

Not all pollutants or pollution sources fall within the purview of the NPDES. Under the CWA, "discharge of pollutant" is defined as "any addition of any pollutant to navigable waters from any *point source*." 33 U.S.C. § 1362(12)(A) (emphasis added). The focus of both the CWA and NPDES, then, trains largely on pollutant discharges from "point sources," a term the Act defines as:

> any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. This term does not include agricultural stormwater discharges and return flows from irrigated agriculture.

Id. at § 1362(14); see also id. at § 1362(6) (defining "pollutant" broadly to include substances ranging from rock and sand to industrial and municipal industrial wastes).

The CWA distinguishes point sources from nonpoint sources. The NPDES recognizes—and functions on the basis of—this distinction, requiring permits only for point source emissions. See, e.g., League of Wilderness Defenders v. Forsgren, 309 F.3d 1181, 1183 (9th Cir. 2002) ("Point source pollution is distinguished from 'nonpoint source pollution,' which is regulated in a different way and does not require [the NPDES] type of permit."). Unlike point sources, nonpoint sources[5] are regulated indirectly: the CWA directs EPA to disseminate information regarding nonpoint pollution sources, see 33 U.S.C. § 1314(f), but it is often through state management programs that nonpoint sources are monitored and controlled. See Oregon Natural Desert Ass'n v. Dombeck, 172 F.3d 1092, 1096–97 (9th Cir. 1998), cert. denied, 528 U.S. 964 (1999).[6]

III.    Procedural History

In an effort to compel PALCO to comply with the putative terms of the CWA, EPIC brought a citizen-suit action under section 505(a) of the CWA, 33 U.S.C. section 1365(a), against PALCO, the EPA, and then-EPA Administrator Christine Todd Whitman.  EPIC's first two claims allege,

generally stated, that PALCO's drainage system employs a number of unpermitted point sources to discharge pollutants; EPIC later added a third claim, alleging that the adoption of a particular EPA regulation—40 C.F.R. section 122.27—constituted an *ultra vires* act.  A number of potentially dispositive motions followed.

On June 6, 2003 the court denied EPA's motion to dismiss and denied PALCO's motion to dismiss in part, concluding that EPIC could pursue a claim under the Administrative Procedures Act ("APA") in this court and that EPIC's claim was not time-barred.  On October 14, 2003 the court denied EPIC's motion for summary adjudication on its third claim for relief, granting EPA's and PALCO's cross-motions for summary adjudication and construing 40 C.F.R. section 122.27 to be consistent with the governing provisions of the CWA.  On January 23, 2004 the court denied PALCO's motion to dismiss EPIC's remaining claims (that is, its first and second claims for relief) under Federal Rule of Civil Procedure 12(b)(6) and held that PALCO's point sources—to the extent they exist—must comply with the terms of the NPDES and the CWA.  On April 19, 2004 the court denied PALCO's motion to certify three of the court's decisions for interlocutory review under 28 U.S.C. section 1292(b).  On July 12, 2005 PALCO filed a Notice of Intent ("NOI") to comply with the terms of the General Permit to Discharge Storm Water Associated With Industrial Activity (WQ Order No. 97-03-DWQ) ("Industrial General Permit" or "IGP") for PALCO's logging operations in the Bear Creek Watershed and Storm Water Pollution Prevention Plan ("SWPPP") which outlines practices and procedures PALCO will implement to reduce or prevent industrial pollutants in storm water discharges.  On April 28, 2006 the court denied defendants' motion for summary judgment with respect to EPIC's first and second claims for relief, rejecting PALCO's argument that the claims were rendered moot by procuring IGP.  The court also denied EPIC's cross-motion for partial summary judgment on the issue of defendants' liability.  The court further ordered additional briefing on the issue of what EPIC must prove to establish defendant's liability under the CWA.

PALCO now urges the court to hold that EPIC does not have standing to bring this suit on its own behalf or on behalf of its members.  EPIC, in turn, asks the court to hold PALCO liable for violations of the CWA.

1

2    LEGAL STANDARD

3    I.       Summary Judgment

4            Summary judgment is proper when the pleadings, discovery, and affidavits show that there is

5    "no genuine issue as to any material fact and that the moving party is entitled to judgment as a

6    matter of law." Fed. R. Civ. P. 56(c).  Material facts are those which may affect the outcome of the

7    proceedings.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material

8    fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the

9    nonmoving party.  Id.  The party moving for summary judgment bears the burden of identifying

10   those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine

11   issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On an issue for which the

12   opposing party will have the burden of proof at trial, the moving party need only point out "that

13   there is an absence of evidence to support the nonmoving party's case."  Id.

14          Once the moving party meets its initial burden, the nonmoving party must go beyond the

15   pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a

16   genuine issue for trial." Fed. R. Civ. P. 56(e).  Mere allegations or denials do not defeat a moving

17   party's allegations.  Id.; see also Gasaway v. Northwestern Mut. Life Ins. Co., 26 F.3d 957, 960 (9th

18   Cir. 1994).  The court may not make credibility determinations, Anderson, 477 U.S. at 249, and

19   inferences drawn from the facts must be viewed in the light most favorable to the party opposing the

20   motion.  Masson v. New Yorker Magazine, 501 U.S. 496, 520 (1991).

21

22   II.      Standing

23          An Article III court cannot entertain the claims of a litigant unless that party has

24   demonstrated the threshold jurisdictional issue of  whether it has constitutional and prudential

25   standing to sue.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  The doctrine of standing

26   encompasses both constitutional and statutory considerations.  Id.  Article III, section 2 of the United

27

28

UNITED STATES DISTRICT COURT
For the Northern District of California

6

1   States Constitution extends the judicial power of the federal courts only to cases or controversies.

2   Steel Co. v. Citizens for a Better Env't, 523 U.S. 83 (1998).

3        The party invoking federal jurisdiction bears the burden of establishing three requirements in

4   order to meet the "irreducible constitutional minimum of standing." Defenders of Wildlife, 504 U.S.

5   at 560. To satisfy Article III's requirements a plaintiff must show "(1) it has suffered an 'injury in

6   fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or

7   hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; (3) it is

8   likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

9   Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. Inc., 528 U.S. 167, 181 (2000) (citing Defenders

10  of Wildlife, 504 U.S. at 560–61). In addition, where Congress is the source of the alleged legal

11  violation, the Supreme Court has recognized a prudential component to standing requiring that the

12  plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the

13  statutory provision invoked. Bennett v. Spear, 520 U.S. 154, 163 (1997).

14       An organization may have standing to sue "in its own right . . . to vindicate whatever rights

15  and immunities the association itself may enjoy," and in doing so, "may assert the rights of its

16  members, at least so long as the challenged infractions adversely affect its members' associational

17  ties." Warth v. Seldin, 422 U.S. 490, 511 (1975). In order to establish organizational standing,

18  plaintiffs must "meet the same standing test that applies to individuals." Spann v. Colonial Vill.

19  Inc., 899 F.2d 24, 27 (D.C. Cir. 1990), cert. denied, 498 U.S. 980 (1990) (internal quotations and

20  citations omitted). "In those cases where an organization is suing on its own behalf, it must establish

21  concrete and demonstrable injury to the organization's activities—with a consequent drain on the

22  organization's resources—constituting more than simply a setback to the organization's abstract

23  social interests. Indeed, the organization must allege that discrete programmatic concerns are being

24  directly and adversely affected by the challenged action." Common Cause v. Federal Election

25  Comm'n, 108 F.3d 413, 417 (D.C. Cir. 1997) (internal quotations omitted). See also Havens Realty

26  Corp. v. Coleman, 455 U.S. 363, 379 (1982).

27

28

7

1    Moreover, even if the organization has not suffered injury to itself, it may have standing to

2   assert the rights of its members if (1) its members would have standing to sue on their own; (2) the

3   interests it seeks to protect are germane to its purpose; and (3) its claim and requested relief do not

4   require participation by individual members.  Hunt v. Washington State Apple Adver. Comm'n, 432

5   U.S. 333, 343 (1977).  See also Warth, 422 U.S. at 511 ("Even in the absence of injury to itself, an

6   association may have standing solely as the representative of its members."); Sierra Club v. Morton,

7   405 U.S. 727, 734–41 (1972) (association must allege that its members are suffering immediate or

8   threatened injury of the sort that would be a justiciable case had members brought suit individually).

9   "The possibility of such representational standing, however, does not eliminate or attenuate the

10   constitutional requirement of a case or controversy."  Warth, 422 U.S. at 511.

11

12   DISCUSSION

13   I.    PALCO's Motion for Summary Judgment

14    A plaintiff must establish that it has constitutional and prudential standing to sue.  Defenders

15   of Wildlife, 504 U.S. at 560.  In order to meet Article III's case or controversy requirement, an

16   organizational plaintiff can either assert standing on its own behalf or standing on behalf of its

17   members.  See Warth, 422 U.S. at 511.  In its motion for summary judgment, PALCO argues that

18   EPIC has neither organizational nor representational standing in the present action. First, PALCO

19   asserts that EPIC cannot demonstrate an injury-in-fact on its own behalf because its services have

20   not been diminished and because an informational injury is insufficient to overcome the injury-in-

21   fact requirement.  EPIC need not demonstrate organization standing. Even if the organization has not

22   suffered injury to itself, it may have standing to assert the rights of its members. Hunt, 432 U.S. at

23   343.  See also Warth, 422 U.S. at 511. Because EPIC need only demonstrate that it has standing on

24   behalf of its members and has done so adequately, the court will not address PALCO's

25   organizational standing arguments.

26    EPIC can successfully allege representational standing "if its members would have standing

27   to sue on their own behalf, the interests at issue are 'germane' to [EPIC's] mission, and neither the

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1   substantive claim nor the remedy sought necessitates the participation of any individual member of

2   [EPIC]."  Ocean Advocates v. United States Army Corps of Eng'rs, 361 F.3d 1108, 1121 (9th Cir.

3   2004) (citing Laidlaw, 528 U.S. at 167).  In its motion for summary judgment, PALCO asserts only

4   that EPIC has failed to show that any of its members would have standing on their own behalf.

5   PALCO does not challenge EPIC's standing based on the other standing requirements—that the

6   interests are germane to EPIC's mission and that the individual participation of EPIC members is not

7   required.  Because the party invoking federal jurisdiction bears the burden of establishing all of the

8   requirements of standing, Defenders of Wildlife, 504 U.S. at 560, the court will examine whether

9   EPIC has established each of the requirements in order to overcome summary judgment.  For

10  representational standing purposes, an organizational plaintiff needs to show that one of its members

11  has standing in his or her own right. See Ward, 422 U.S. at 511. Therefore, the court need only

12  address the standing of a single EPIC member who meets the constitutional requirements.

13         In order to satisfy the standing requirement of Article III, an individual plaintiff must show

14  that "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or

15  imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action

16  of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be

17  redressed by a favorable decision." Laidlaw, 528 U.S. at 180–81; Morton, 405 U.S. at 734–41.

18  Here, PALCO asserts that Richard Gienger and Paul Mason have not satisfied the injury-in-fact

19  requirement. The court disagrees for the reasons discussed below.

20         A.     Standing of EPIC Individual Members

21             1.     Richard Gienger

22         PALCO asserts that Mr. Gienger has not established an individual, particularized injury

23  distinct from EPIC's institutional interests.  As an independent contractor for EPIC, defendants

24  argue that Mr. Gienger's interests have merged with those of the organization.  Therefore,

25  defendants maintain that EPIC cannot assert representational standing based on Mr. Gienger's

26  standing. Assuming *arguendo* that Mr. Gienger was paid for all of his activities in Bear Creek,

27

28

UNITED STATES DISTRICT COURT
For the Northern District of California

9

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1    defendants have provided no case law to support the proposition that such an employee would not

2    have standing in his own right to assert claims based on injuries suffered *qua* employee.  Indeed,

3    Smith v. Pacific Props. & Dev. Corp., 358 F.3d 1097 (9th Cir. 2004), a case cited by PALCO in its

4    motion, would suggest otherwise.  That case held that housing testers, some of whom may be

5    compensated for their work, had standing to bring suits for violations of the Fair Housing

6    Amendments Act.  Id. at 1105.  Other cases, several of which EPIC cites in its opposition, suggest

7    no such merger doctrine for employees exists. See, e.g.,  NRDC v. Southwest Marine, Inc., 945

8    F.Supp. 1330, 1334 (S.D. Cal 1996), aff'd 236 F.3d 985 (9th Cir. 2000).  Additionally, PALCO has

9    provided no evidence to show that all of Mr. Gienger's alleged injuries for standing purposes arise

10   from his position as an independent contractor.  See Def's Opp'n, at 13:27-14:24. PALCO has

11   established only that Mr. Gienger was reimbursed for costs incurred when visiting Bear Creek,

12   although it is far from certain that EPIC distributed funds for this purpose.  Gienger Supp. Dec. ¶ 17.

13   Regardless of whether Mr. Gienger's injuries arose from his work as an independent contractor,

14   there is no barrier to an employee establishing a particularized injury based on his employment with

15   an organization of which he is also a member.  Furthermore, Mr. Gienger can also establish standing

16   as a member.  The fact that the two positions, "employee" and "member," may overlap in their

17   experiences does not mean that the totality of his experiences cannot be considered.

18        As the court has noted, Mr. Gienger must show injury-in-fact, causation, and redressability to

19   establish standing.  A plaintiff alleging violations of the CWA can establish injury-in-fact by

20   showing "a connection to the area of concern sufficient to make credible the contention that the

21   person's future life will be less enjoyable—that he or she really has or will suffer in his or her degree

22   of aesthetic or recreational satisfaction—if the area in question remains or becomes environmentally

23   degraded."  Ecological Rights Found. (ECF) v. Pac. Lumber Co., 230 F.3d 1141, 1149 (9th Cir.

24   2000).  Mr. Gienger has sufficiently established that he has visited the specific area in question, the

25   Bear Creek watershed, frequently for the purposes of both recreation, Gienger Tr. at 78:1–6, and his

26   conservation interests, e.g., Gienger Tr. at 75:23–25; 76:1–2.  Cf. Lujan v. National Wildlife Fed'n,

27   497 U.S. 871, 886-89 (1990) (denying standing because members of environmental organization had

28

only visited "the vicinity" of the land involved in dispute).  He has personally observed the sediment in Bear Creek which EPIC attributes to PALCO.  Gienger Dec.¶¶ 12 & 16.  Mr. Gienger's recreational and conservation interests are harmed by the sediment deposited.  Id.  He has thus demonstrated a "tangible, continuing connection" to the particular location affected sufficient to establish injury-in-fact for standing purposes.  ECF, 230 F.3d at 1148.   According to Mr. Gienger's testimony, his various interests are harmed by PALCO's failure to secure a permit NPDES permit.  Gienger Supp. Dec. ¶ 9.  He has therefore satisfied the causation requirement for standing.  Finally, Mr. Gienger states that his injuries will be redressed if this court enjoins PALCO from discharging stormwater without a NDPES permit.  The court concludes that Mr. Gienger has satisfied the Article III standing requirements, and, therefore, EPIC may properly base its representational standing claim on Mr. Gienger.

> 2.   Paul Mason

While the standing of a single member is sufficient to establish an organization's standing, the court will examine the standing of a second EPIC member, Paul Mason,[7] for prudential reasons.  PALCO has not offered any direct challenges to Mr. Mason's standing beyond the argument that Mr. Mason cannot demonstrate a concrete and particularized injury-in-fact because he resides in Sacramento, several hundred miles away from Bear Creek.  "Factors of residential contiguity and frequency of use may certainly be relevant to that determination, but are not to be evaluated in a one-size-fits-all, mechanistic manner."  ECF, 230 F.3d at 1149; see also Friends of the Earth v. Gaston Copper Recycling Corp., 204 F.3d 149, 159–60 (4th Cir. 2000) (en banc) (same).  Should Mr. Mason visit the Bear Creek area only once a year, he would not be "precluded from litigating to protect the environmental quality of [that area] simply because he cannot visit more often."  ECF, 230 F.3d at 1150.  Mason has satisfied the requirements for injury-in-fact illuminated in ECF: repeated use as well as credible allegations of future use.  Id. at 1149.  He has visited Bear Creek over a dozen times before this suit commenced as well as several times during the epic tenure of this

UNITED STATES DISTRICT COURT
For the Northern District of California

suit.  See Mason Tr. 90:13–20(visits prior to 2001); 87:22–25-88:1-3 (visit in September 2005).

Moreover, he has expressed his intent to visit Bear Creek in the future.  Mason Supp. Dec. ¶4.   He

has sufficiently demonstrated that he has aesthetic, recreational, and conservational interests in Bear

Creek and that these interests are harmed by PALCO's alleged activities.  Like Mr. Gienger, Mr.

Mason has established that redress of these injuries is appropriate through this court.  Accordingly,

the court concludes that Mr. Mason has individual standing to bring this suit.


3.      Craig Bell

PALCO asserts that Craig Bell does not have standing in this case because he was not a

member of EPIC at the time this suit was initiated.  To support this contention, PALCO relies upon

Friends of the Earth, Inc. v. Crown Cent. Petroleum Corp, 95 F.3d 358, 360 (5th Cir. 1996).  In that

case, the Fifth Circuit merely recited the fact that the district court had found that several of the

standing witnesses had not been members of the plaintiff organization at the inception of the suit.

EPIC presents no case law to support its contention that representational standing may be based on a

member who joined the organization after the suit has been filed.  At most, EPIC would have

standing to sue based on Bell's injuries from 2003, when he joined EPIC.  Because the court has

determined that two of EPIC's other members properly have standing in this case, it is not necessary

to decide whether EPIC may invoke standing based on Bell's individual standing.


4.      Bill Eastwood

PALCO advances three arguments against Bill Eastwood's assertions of standing.  First,

PALCO  alleges that Mr. Eastwood has not suffered a particularized and concrete injury. Second, it

contends that his fishing interests in the watershed are too generalized to satisfy the personal and

particularized injury-in-fact requirement.  Finally, PALCO argues that the geographic distance

between his conservational activities with salmon in Eel Creek and Bear Creek cannot survive the

traceability requirement for standing.

12

Mr. Eastwood has not visited Bear Creek but has repeatedly observed it when driving over the creek in his car.  This indirect contact with the area is insufficient to establish standing under the Supreme Court's reasoning in <u>Laidlaw</u>.  In that case, the individual members of an organizational plaintiff alleged that they were deterred from visiting an area because of alleged environmental violations. <u>See</u> <u>Laidlaw</u>, 528 U.S. at 181–82 (member averred that he would like to visit the river as he had done as a teenager but would not do so because of his concerns about pollution in the river, which he observed during his occasional drives over the river); <u>see also</u> <u>ECF</u>, 230 F.3d at 1150 (assertions of deterrence to exercise recreational interests were sufficient to establish injury-in-fact). In this case, Mr. Eastwood alleges no such deterrence from exercising his other interests in Bear Creek.  He merely observes the Creek during his many drives over it and claims to be harmed by his observations of muddy, turbid water.  Eastwood Tr. at 92:15–18.  Therefore, Mr. Eastwood has not sufficiently established that he has suffered a personal and particularized injury.

B.  <u>Germaneness</u>

Having established that two of its members have individual standing, EPIC must also show that the interests it seeks to protect are germane to its organizational purpose.  EPIC's organizational goals are to promote "clean water and healthy watersheds through public education and outreach, grassroots citizen advocacy and strategic litigation."  Mason Dec. ¶ 4. The interests in this case involve the protection of the Bear Creek and the Eel Creek watershed and are germane to EPIC's stated purpose.  <u>See</u>  <u>Ocean Advocates</u>, 361 F.3d at 1121.

C.  <u>Need for Individual Member Participation</u>

The final requirement for representational standing is prudential. To claim representational standing, the litigation involved must not require the participation of individual members.  This requirement depends in large part on the nature of the relief being sought.  When an organization seeks prospective, equitable relief, "it can reasonably be supposed that the remedy, if granted, will

13

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1   inure to the benefit of those members of the association actually injured." <u>Warth</u>, 422 U.S. at 515. In

2   its complaint, EPIC seeks declaratory and injunctive relief as well as civil penalties and restitutions.

3   FAC ¶¶ 65–69.  If granted, any of these forms of relief will inure to the benefit of the organization

4   and its members.  Nor is there any need for individualized proof because neither the "claims nor the

5   relief sought require[] the District Court to consider the individual circumstances of any aggrieved []

6   member." <u>International Union, United Auto. Workers v. Brock</u>, 477 U.S. 274, 287 (1986).  EPIC's

7   claims are based on the injuries to Bear Creek and the surrounding watershed and, as such, do not

8   require individualized proof.  The parties have not raised the issue of whether EPIC has satisfied the

9   zone of interests requirement, and it does not seem to be in issue.  Therefore, the court concludes

10  that EPIC has standing in its capacity as a representative of its members.

11      In sum, EPIC has demonstrated that it has representational standing to bring this suit on

12  behalf of its members.  Accordingly, the court DENIES PALCO'S motion for summary judgment on

13  standing.

14

15  III.   EPIC's Motion for Summary Judgment

16      EPIC asks this court to grant summary judgment on its first and second claims for relief.

17  EPIC contends that it has shown that PALCO has violated both section 301(a) of the CWA, codified

18  at 33 U.S.C. § 1311(a) and section 402(p) of the CWA, codified at 33 U.S.C. § 1342(p) and is

19  therefore entitled to summary judgment.

20

21      To support its claims, EPIC's experts recorded evidence of alleged discharges at seventeen

22  different sites ("Locations No. 1–17") in the Bear Creek watershed.  Based primarily on that

23  evidence, EPIC alleges that PALCO is liable for (1) 13 violations of section 301(a) by discharging

24  sediment on certain dates from specific point sources in the Bear Creek watershed without securing

25  a NPDES permit; (2) 5,957 violations of section 402(p) for failing to apply for and obtain coverage

26  under California's general permit for discharges of storm water associated with industrial activity

27  from March 8, 2004 to July 12, 2005 at each of 17 discharge points; and (3) 2,633 violations of

28

14

1   section 402(p) for discharges of stormwater associated with industrial activity without a NPDES

2   permit for the period May 25, 1996 to March 8, 2004.  PALCO argues that EPIC has failed to make

3   a prima facie case for violations of the CWA.

4

5       A.      Section 301(a)

6       To meet its burden under section 301(a),[8]  EPIC contends that it must show that PALCO (1)

7   discharged (2) a pollutant (3) from a point source (4) to navigable waters (5) without an NPDES

8   permit.  PALCO does not dispute this enumeration of EPIC's burden.  Def's Add. Br. at 3  n.2.  This

9   understanding comports with the elements set out by the Ninth Circuit.  See Committee to Save

10  Mokelumne River v. East Bay Mun. Util. Dist., 13 F.3d 305, 309 (9th Cir. 1993).  The parties

11  disagree, however, on the evidence required to prove each element.  The court will address in turn

12  each element and assess the evidence proffered by EPIC to satisfy each element.

13

14

15      1.      Discharge

16      Section 501(12) of the CWA defines "discharge of any pollutant" as "any addition of any

17  pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12).  The Ninth Circuit has

18  addressed the definition of this term in Mokelumne River, 13 F.3d at 308.  The court held that

19  surface runoff collected and channelled in diversion ditches, channels, and gullies, inter alia,

20  satisfied the definition of discharge.  Id. at 307, 308.  In doing so, the court distinguished its holding

21  from two cases involving dams, which did "not add pollutants from the outside world."  Id. at 308

22  (discussing National Wildlife Fed'n v. Consumers Power Co., 862 F.2d 580, 584 (6th Cir. 1988) and

23  National Wildlife Fed'n v. Gorsuch, 693 F.2d 156, 165 (D.C. Cir. 1982) (emphasis in original).

24      PALCO contends that to prove the addition of a pollutant, EPIC must conduct sampling of

25  the runoff before it reached the discharge locations to prove that the sediment was added at the that

26  discharge location.  PALCO argues that without a point of comparison EPIC cannot prove that

27

28

1   pollutant was added or discharged.  PALCO even suggests that water may prove to be cleaner when

2   it left the various discharge points than when it entered.  Def's Opp. at 19 n.12. This precise

3   argument was advanced and rejected in Mokelumne River, 13 F.3d at 309.

4          The Ninth Circuit has indicated that there is no such requirement.   In Rybacheck v. EPA,

5   904 F.2d 1276 (9th Cir. 1990), the court upheld EPA's interpretation of "addition" to include both

6   redepositing material from the streambed into the stream as well as depositing material from outside

7   the stream into it; cf. Headwaters, Inc. v. Talent Irrigation Dist., 243 F.3d 526 (9th Cir. 2001) (direct

8   application of herbicide into irrigation canals constituted a discharge under the CWA). Similarly, the

9   court concluded that there was no material dispute of fact raised by the defendants' contention that

10  there was no net increase in acidity of runoff from a facility. Mokelumne River, 13 F.3d at 309.

11  PALCO's attempts to distinguish Mokelumne River are unpersuasive.  The CWA "categorically

12  prohibits any discharge of a pollutant from a point source without a permit." Id. at 309.  EPIC need

13  not conduct sampling above the road prism in order to demonstrate a discharge.

14         EPIC offers evidence collected at twelve different discharge points on thirteen separate

15  occasions to establish violations of section 301(a). Pl's Mot. at 41. To prove each discharge, EPIC

16  offers eyewitness observations at each of the sites as well as photographic and video documentation

17  of some of the discharges.  See, e.g., id. at 23 (describing documentation at Location No. 4).  EPIC

18  also measured the turbidity levels at many of the alleged points of discharge.  See, e.g., Lozeau

19  Decl., Ex. J ("Proposed Testimony of Dr. Andrew Collison Regarding Sediment Sources

20  and Delivery to the Waters of Bear Creek," by Andrew Collison, Ph.D.) ("Collison Report") at B-1

21  (discussing turbidity levels and subsequent lab analysis of sediment concentration found at site No.

22  1).  In response, PALCO argues that EPIC's evidence of additions of pollutant is faulty at several of

23  the locations.  PALCO contends that the measurement techniques employed by EPIC's experts were

24  unreliable at Locations No. 6 and No. 11 and may have artificially introduced sediment into the

25  samples.  Def's Opp. at 31, 35.  Similarly, it argues that the conditions at Locations No. 7 and 8

26  indicate that water flowed through natural materials before EPIC took the samples, which would

27

28

UNITED STATES DISTRICT COURT
For the Northern District of California

16

1   render the measurements of sediment unreliable.  Id. at 32.  Finally, PALCO contends that since no

2   measures of sediment were taken at Location No. 5, EPIC cannot establish the addition of sediment

3   at that location.  Id. at 30.  In light of the eyewitness accounts of discharges at each location,

4   PALCO's contentions raise issues as to the weight of the evidence, which the court cannot decide on

5   summary judgment.  However, PALCO's arguments do indicate that there is a genuine issue of

6   disputed fact on the issue of discharge at Locations Nos. 5, 6, 7, 8 and 11.  EPIC has sufficiently

7   established the element of discharge with respect to the other locations.

8

9

10                2.        Pollutant

11          The CWA expressly includes sediment in its definition of pollutant.  33 U.S.C. § 1362(6).

12   EPIC presents evidence of the presence of sediment at each of the thirteen alleged discharges in the

13   form of expert witness observation, turbidity measurements, and video and photographic

14   documentation.  It is difficult to disentangle the evidence necessary to prove discharge from that

15   needed to establish the presence of the pollutant.  Where PALCO has raised questions of fact about

16   discharges for Locations No. 5, 6, 7, 8, and 11, it has created issues of fact for this element as well.

17   For the other locations, the evidence presented is sufficient to establish that a pollutant was present

18   in the discharges at those sites.

19

20                3.        From a Point Source

21          The parties disagree about whether this element is in fact one element or two.  In its

22   opposition, PALCO urges the court to interpret "from a point source" as two distinct elements:

23   "from" and "point source." Def's Opp. at 14. Notably, PALCO did not make this distinction in its

24   additional briefing on the elements of proof required to demonstrate liability under the CWA.

25   PALCO argues that the "from" element mandates a direct connection between the point source and

26   the navigable water.  Id.  It further argues that EPIC must provide evidence to demonstrate that the

27   alleged point sources connected to a navigable water during EPIC's observations of the thirteen

28

17

1   alleged discharges.  The court finds that the issue of connectivity between a point source and a

2   navigable water is better addressed as part of the element "to navigable waters" and will discuss it

3   there.

4        Establishing that PALCO operates point sources has been the crux of this dispute from the

5   outset.  In its April 28, 2006 order, the court advised EPIC to put forth actual proof that PALCO

6   made discharges from a discrete point source or sources into Bear Creek.  At that time, the court

7   noted that EPIC had provided no specific statements or evidence that PALCO operates point sources

8   such as culverts, ditches or conduits from which storm water or pollutants are discharged into Bear

9   Creek.

10       The CWA provides a definition of point source in 33 U.S.C. § 1362(14):

11
12       The term 'point source' means any discernible, confined and discrete conveyance,
         including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete
13       fissure, container, rolling stock, concentrated animal feeding operation, or vessel or
         other floating craft, from which pollutants are or may be discharged. This term does not
14       include agricultural stormwater discharges and return flows from irrigated agriculture.

15   EPIC argues that unpaved logging roads are sources of sediment and that the sediment is discharged

16   via inboard ditches to stream crossing culverts, ditch relief culverts and cross drain culverts, and

17   rolling dips.  PALCO argues that these road features are Best Management Practice ("BMPs") in

18   compliance with the California Forest Practice Rules and cannot be point sources.  According to

19   PALCO, the BMPs are designed to disperse storm water on the hillside in order to promote natural

20   filtration.  Under this argument, a device designed to lessen runoff could never be a point source.

21   Thus, the court is faced with two issues.  First, whether as a matter of law these BMPs can be point

22   sources.  Second, as a matter of fact, whether EPIC has proven that these are point sources.

23       Courts have interpreted the term point source broadly to include, *inter alia*, a gold leachate

24   system capable of overflowing,  United States v. Earth Scis., Inc., 599 F.2d 368 (10th Cir. 1979); a

25   cattle feedlot capable of discharging pollutants during an extreme storm event, Carr v. Alta Verde

26   Indus., Inc., 931 F.2d 1055 (5th Cir. 1991); and leachate that flowed into a pond and through a

27   culvert to a marsh, Dague v. City of Burlington, 935 F.2d 1343 (2d Cir. 1991).  These

28

UNITED STATES DISTRICT COURT
For the Northern District of California

18

interpretations of point source suggests that the term includes ditches and culverts like the ones EPIC alleges to be point sources.  The Eleventh Circuit has held that  stormwater collected and channeled by pipes and culverts can be point sources.  See Driscoll v. Adams, 181 F.3d 1285 (11th Cir. 1999) (reversing grant of summary judgment for defendants and concluding that discharge was a point source on the basis that "it is undisputed that Adams collected stormwater by pipes and other means, and that the stormwater was discharged into the stream").  The strongest support for this point finds its source in the plurality opinion written by Justice Scalia in Rapanos v. United States, __ U.S. ___, 126 S. Ct. 2208 (2006) where he contrasts the term "navigable waters" with "point source."  In doing so, the opinion describes point source as "watercourses through which intermittent waters typically flow" such as ditches.  Id. at 2223.  But see 126 S.Ct. at 2243 (Kennedy, J., concurring) (contending that intermittent flows may be characterized as navigable waters).

In determining the evidentiary showing required to establish a point source, courts considering similar facts have concluded that runoff channeled through ditches is a point source. The Fifth Circuit has adopted the position that "surface runoff collected or channeled by the operator constitutes a point source discharge." Sierra Club v. Abston Constr. Co., 620 F.2d 41, 44 (5th Cir. 1980).  In determining that liquid manure spreading operations are a point source, the court concluded that a swale, which is a ditch on a contour, coupled with the pipe leading into the ditch that leads into the stream was a point source. Concerned Area Residents for the Env't v. Southview Farm, 34 F.3d 114, 118 (2d Cir. 1994).  Additionally, defendants need not construct the conveyances "so long as they are reasonably likely to be the means by which pollutants are ultimately deposited into a navigable body of water." Id. at 45.  The Tenth Circuit "had no problem finding a point source" in the use of sumps and ditches to drain a mining operation. Earth Sciences, 599 F.2d at 374. That court found a point source where liquid overflows a wall or flows through a fissure in a sump. Id.  ("[T]he escape of liquid from the confined system is from a point source.").  While PALCO contends that remedial measures, such as the BMPs in this case, can never be point sources, the Earth Sciences opinion suggests otherwise. Id.  When a device or system designed to channel or diffuse runoff fails and instead channels runoff into a navigable water, the points of failure such as

UNITED STATES DISTRICT COURT
For the Northern District of California

1    the sump fissures in <u>Earth Sciences</u> can be point sources.  Similarly, in <u>Mokelumne River</u>, the Ninth

2    Circuit found that efforts by the California Water Regional Quality Control Board to eliminate

3    runoff from acid mine drainage were discharging pollutants under the terms of the CWA.  13 F.3d at

4    310 (Ferndandez, J., concurring).[9]  As a matter of law, BMPs may be point sources.

5        The second inquiry concerns whether EPIC has made an evidentiary showing sufficient to

6    demonstrate that the ditches and culverts at each of the twelve locations are point sources.  It has

7    not.  The Ninth Circuit has not directly addressed the type of evidence required to prove that

8    sedimentary discharges from ditches and culverts are point sources.  In <u>Pronsolino v. Nastri</u>, 291

9    F.3d 1123, 1126, (9th Cir. 2002), the court gave sediment runoff from timber harvesting as an

10   example of a nonpoint source, but this example was merely dicta.  In the same case, the court

11   described erosion related to road surfaces as nonpoint source, but this was merely a recitation from

12   the district court's opinion which relied on the parties' classifications of pollution as nonpoint

13   source.  <u>See</u> <u>Pronsolino v. Marcus</u>, 91 F. Supp. 2d 1337, 1340 (N.D. Cal. 2000) (Alsup, J.) (citing to

14   Joint Statement of Undisputed Facts).  The Ninth Circuit made that determination after reviewing a

15   full record and a jury's findings of fact.  In <u>Trustees for Alaska v. EPA</u>, 749 F.2d 549, 558 (9th Cir.

16   1984), the court concluded only that the EPA did not exceed its authority in regulating as a point

17   source "discharge water [] released from a sluice box" because it was "a confined channel" within

18   the definition of point source. However, that case involved the review of a determination of the EPA

19   not a factual finding that a certain discharge is a point source.

20       The sum of authority indicates that whether a ditch, culvert, or other BMP may consitute a

21   point source is a highly fact-based inquiry.  EPIC must demonstrate that these BMPs are discrete

22   conveyances that channel runoff.  PALCO raises a disputed issue of fact as to whether any of the

23   ditches in question channel or instead diffuse water.  In particular, PALCO questions EPIC's

24   observations as to how the storm water entered the tributaries.  <u>See</u> Def's Opp'n at 26 (raising

25   questions about Location No. 1).  If, as PALCO contends, the water enters in diffuse form, then the

26   ditches and culverts have not channeled the water and these ditches are not point sources.  On the

27   other hand, if EPIC demonstrates that the ditches channel the water into the tributaries, the ditches

28

are likely point sources.  EPIC has not sufficiently demonstrated for each of these locations that the water was channeled, and therefore it has not proven that the twelve locations are point sources.

### 4.    To Navigable Waters

As an initial matter, the parties agree that Bear Creek is a navigable water pursuant to 33 U.S.C. section 1362(7).  JSUF, Fact No. 12 (March 1, 2006).   The parties disagree as to two matters: first, the correct legal standard for navigable waters; second, what evidence is required and whether EPIC's evidentiary proffer is sufficient to show that the streams in question are navigable waters.  A third, related issue concerns whether EPIC must show that the point source directly delivered the sediment by demonstrating that the runoff reaches Bear Creek by surface flow and that the runoff contains a pollutant when it enters Bear Creek.

First, EPIC argues that the Class II and Class III streams into which it observed discharges from each of the twelve alleged point sources are navigable waters.  The Supreme Court recently refined the test for navigable waters.  Rapanos, 126 S.Ct. at 2221; id. at 2251 (Kennedy, J., concurring).  That case was decided 4-4-1, with Justice Scalia writing an opinion for the plurality, Justice Kennedy writing a separate opinion and concurring in the judgment, and Justice Stevens writing for the dissenters.[10] Although there is some argument that the plurality and concurring opinions provide two alternative standards for CWA jurisdiction,[11] the Ninth Circuit's interpretation of Rapanos is binding on this court.  In Northern Cal. River Watch v. City of Healdsburg, 457 F.3d 1023, 1023 (9th Cir. 2006), the Ninth Circuit concluded that the significant nexus test set out in Justice Kennedy's concurrence is controlling.  Therefore, EPIC must demonstrate that the streams in dispute have a significant nexus to Bear Creek.

Under the significant nexus test, the party seeking to invoke the court's jurisdiction must present evidence of a hydrologic connection.  Rapanos, 126 S. Ct. at 2250–51 (Kennedy, J., concurring).  That connection may suffice in some but not all cases to show "some measure of the significance of that connection for downstream water quality"  Id. at 2251.  EPIC has offered

1   evidence in PALCO's GIS maps, which it claims is the best information available, to demonstrate a

2   hydrological connection between each of the streams in dispute and Bear Creek.  Collison Report at

3   3.  PALCO argues that the maps, without firsthand observations of the connections between the

4   streams and Bear Creek, are insufficient to establish a substantial nexus.  PALCO also contends that

5   the even if the maps were sufficient, they are unreliable.  The court finds that EPIC's reliance on the

6   map is sufficient to establish some sort of a hydrological connection, even for those Class II and

7   Class III streams which are intermittent waterflows.  PALCO has offered only assertions as to the

8   maps' unreliability but has not offered facts to demonstrate that the maps indicated a connection

9   between any of the streams in question and Bear Creek which did not in fact exist.  At the summary

10  judgment stage, the non-moving party must set forth "specific facts showing that there is a genuine

11  issue for trial."  Fed. R. Civ. P. 56(e).  PALCO has not put forth specific facts to rebut EPIC's

12  showing and create a genuine factual dispute as to the hydrologic connection between the streams

13  and Bear Creek.

14      A hydrologic connection without more will not comport with the Rapanos standard in this

15  case.  Because the evidence indicates that certain of the Class II and all of the Class III streams are

16  intermittent or ephemeral watercourses, see Collison Report at 3, EPIC must demonstrate that these

17  streams have some sort of significance for the water quality of Bear Creek.  None of the evidence

18  offered by EPIC—field observations, the GIS map, or expert testimony—address this part of the

19  substantial nexus standard.  In Northern Cal. River Watch v. City of Healdsburg, No. 01-04686,

20  2004 WL 201502 (N.D. Cal. Jan. 23, 2004) (Alsup, J.), aff'd, 457 F.3d 1023 (9th Cir. 2006), a

21  decision rendered before Rapanos but affirmed by the Ninth Circuit in light of Rapanos, the court

22  considered both evidence of surface connections between a pond and a navigable water as well as

23  ecological connections.  Id. at *30 (relying upon similar connections in United States v. Riverside

24  Bayview Homes, Inc., 474 U.S. 121 (1985).  Ecological evidence is not a *sine qua non* for

25  establishing a substantial nexus; however, EPIC has provided no evidence that the streams

26  "significantly affect the chemical, physical, and biological integrity of other covered waters."

27

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1  Rapanos, 126 S. Ct. at 2248 (Kennedy, J., concurring).  The court finds that EPIC has not

2  established that the streams are navigable waters.

3      Finally, PALCO argues that EPIC must provide proof to "demonstrate the flow of pollutant

4  along" the stream and into Bear Creek.  Rapanos, 126 S. Ct. at 2228.  See also Concerned Area

5  Residents for Env't v. Southview Farm, 34 F.3d 114, 118–19 (2d Cir. 1994). However, this

6  requirement, if it exists, comes from Justice Scalia's plurality opinion in Rapanos, which has not

7  been adopted by the Ninth Circuit.  Therefore, the court concludes that this additional showing is not

8  necessary under the substantial nexus test.

9      In sum, EPIC has sufficiently shown that a hydrologic connection exists between Bear Creek

10  and the streams in question. However, EPIC has not shown that those streams are significant to the

11  water quality of Bear Creek.  EPIC must make this showing to establish a substantial nexus and meet

12  the definition of navigable waters under the CWA.

13

14

15      5.    Without a Permit

16      The final element of a prima facie showing for violations of section 301 is that the defendant

17  discharged without an NPDES permit. PALCO admits that it did not have an NPDES permit at the

18  time of the discharges documented by EPIC.  JSUF at 25 (March 1, 2006).  PALCO filed a NOI on

19  July 12, 2005; the alleged discharges observed by EPIC occurred on various dates in March 2004

20  and March 2005.  See Pl's Mot., at 43 (presenting a table of the thirteen discharges observed with

21  dates of observation).

22      However, PALCO argues that some of the alleged discharges, including Location No. 9,

23  occurred on property that is not PALCO's land.[12] Def's Opp'n, at 33.  EPIC must prove that PALCO

24  could have obtained a permit for discharges on land that PALCO does not own or control.  EPIC has

25  not met its burden with respect to this element to the extent that any of the locations belong to

26  landowners other than PALCO.  As to locations owned or controlled by PALCO, EPIC has made a

27  sufficient showing on this element.

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1    In sum, however, for the reasons stated above as to all of the required factors, EPIC has not

2    made out a prima facie case under section 301.

3

4        B.    Section 402(p)

5        EPIC alleges two different bases for violations of section 402(p).  First, it argues that

6    PALCO violated section 402(p) by failing to obtain a permit for discharges of storm water

7    associated with industrial activities from March 8, 2004 to July 12, 2005 at each of seventeen

8    discharge points.  Second, it contends that PALCO violated section 402(p) for failure to obtain a

9    permit for similar discharges during the period May 25, 1996 to March 8, 2004.  For the first set of

10   claims, EPIC asserts an individual violation for each of seventeen alleged discharges for each day

11   between the time EPIC observed the discharge until PALCO obtained a permit, a total of 5,957

12   claimed violations.  For the second set of claims, EPIC argues an individual violation for each day

13   PALCO was without a permit.  It counts backwards from, March 8, 2004, the day that EPIC first

14   observed an alleged discharge on any of PALCO's locations, to May 25, 1996, the day the statute of

15   limitations began to run on this action.  Pl's Mot. at 7.  This calculation produces a total of 2,633

16   violations, according to EPIC.

17

18       The parties disagree as to the requirements for section 402(p) liability in two respects.[13]

19   First, EPIC contends that it need only prove discharge of storm water, without a pollutant, to

20   establish PALCO's liability under section 402.  Second, PALCO contends that failure to apply for a

21   permit is not an element under section 402.  Finally, the court considers whether EPIC can state a

22   claim under section 402(p) for discharging without a permit.

23       First, the parties dispute whether section 402 liability may be imposed for the discharge of

24   stormwater only or whether discharge of a pollutant is required.  EPIC contends that section 402(p)

25   regulates the discharge of stormwater associated with industrial activity, a term it construes loosely,

26   and as such it may demonstrate a violation of section 402 by showing discharges of stormwater

27   without the presence of pollutants.  The court need not decide this issue because the evidence EPIC

28

24

1   presents to establish violations of section 402(p) at the seventeen locations includes some evidence

2   of sediment, a pollutant.  At most of the locations, EPIC's experts measure sediment levels and

3   turbidity.  Even when EPIC's experts did not do so, they documented their observations of "muddy

4   water" at Locations 15 and 17, which the court takes as an allegation of the presence of sediment.

5   Def's Opp. at 39, 40–41.  At Location 16, Mr. Bond observed "silts and sands" discharged onto the

6   hillside.  Lozeau Dec., Ex. Q-8.  Because EPIC has not provided evidence of discharge of

7   stormwater without the presence of a pollutant, the court need not decide whether the presence of

8   pollutants is required for section 402 liability.

9       PALCO argues that EPIC cannot maintain a cause of action for failure to apply for a permit

10  under section 402(p). EPIC, in turn, contends that the elements of section 402 liability include

11  failure to apply for an NPDES permit.  However, EPIC provides no statutory or case law support for

12  this element in its supplemental briefing nor in its moving papers other than the fact that section

13  402(p)(4)(A) sets out that "[a]pplications for permits for such discharges shall be filed no later than

14  3 years after such date of enactment [enacted Feb. 4, 1987]." 33 U.S.C. § 1342(p)(4)(A).  The

15  statutory text does not employ the language of duty, rather it proscribes a timeline for the filing of

16  applications where appropriate.  The Second Circuit addressed a similar argument in Waterkeeper

17  Alliance, Inc. v. United States EPA, 399 F.3d 486, 505 (2d Cir. 2005).  That case involved a

18  challenge to an EPA rule requiring all Concentrated Animal Feeding Operations (CAFOs) to apply

19  for an NPDES permit regardless of whether they had in fact discharged any pollutants under the

20  CWA.  The court in strong language disavowed this interpretation as inconsistent with the text and

21  purpose of the CWA. Id. at 506. "[I]n the absence of an actual addition of any pollutant to navigable

22  waters from any point, there is no point source discharge, no statutory violation, no statutory

23  obligation of point sources to comply with EPA regulations for point source discharges, and no

24  statutory obligation of point sources to seek or obtain an NPDES permit in the first instance." Id. at

25  505.  The court declines to adopt such a duty as an element of section 402 liability.

26      In order to establish a violation of section 402, EPIC would need to establish that PALCO

27  had failed to comply with the terms of an NPDES permit. Section 402 sets out the permitting

28

25

1   requirements for NPES permits.  Section 402(h) affords a cause of action for noncompliance with a

2   permit.  See Laidlaw, 528 U.S. at 174. As noted above, it confers no independent cause of action

3   other than that for noncompliance.  The court has found no cases in which a plaintiff has maintained

4   a separate cause of action under section 402 for discharges.  Liability under the CWA for discharges

5   is appropriately brought under section 301.

6        Therefore, the court concludes that plaintiff has failed to establish PALCO's liability under

7   section 402.

8

9   CONCLUSION

10       For the foregoing reasons, the court hereby DENIES defendants' motion for summary

11

12  judgment with respect to standing and DENIES plaintiff's motion for partial summary judgment on

13  the issue of defendants' liability.

14

15

16

17       IT IS SO ORDERED.

18

19

20

21  Dated:    January 5, 2007

22                                          MARILYN HALL PATEL

23                                          District Judge

24                                          United States District Court

25                                          Northern District of California

26

27

28

26

**UNITED STATES DISTRICT COURT**
For the Northern District of California

**ENDNOTES**

1.  Pursuant to Federal Rule of Civil Procedure 25(d)(1), Michael Leavitt, new Administrator of EPA, automatically replaces his predecessor in this suit.  See Fed. R. Civ. P. 25(d)(1).

2.  Pursuant to the parties' stipulation, PALCO's motion for summary judgment as to EPIC's claims alleging violations of the California Unfair Competition Law is stayed pending a final decision by the California Supreme Court on its review of cases concerning the question of whether the terms of Proposition 64 apply to cases pending at the time Proposition 64 became law.

3.  Both Pacific Lumber and Scotia Pacific Lumber Company are Delaware corporations; both maintain principal places of business in Scotia, California.

4.  The EPA delegated its permit-issuing authority to California on May 14, 1973.  See 39 Fed. Reg. 26,061 (July 16, 1974).  California administers its portion of the NPDES program through the Porter-Cologne Water Quality Control Act ("Porter-Cologne Act"), Cal. Water Code § 13000 et seq., which, in turn, created a group of Regional Water Quality Control Boards charged with the responsibility of issuing Waste Discharge Requirements ("WDRs").  By every relevant measure, WDRs are equivalent to CWA permits, and in every relevant sense for this action, the Porter-Cologne Act imports its definitions from the CWA, including those for "pollutants," "discharge," and "point source."  See Cal. Water Code § 13373.

5.  As the Ninth Circuit has noted, "nonpoint source pollution is not statutorily defined."  League of Wilderness Defenders, 309 F.3d at 1184.  As the Ninth Circuit has also noted, "nonpoint source pollution . . . is widely understood to be the type of pollution that arises from many dispersed activities over large areas . . . not traceable to any single discrete source."  Id.  The paradigmatic example of nonpoint source pollution, the Ninth Circuit adds, is automobile residue—whether rubber, metal, oil, or gas—left on the roadways.  Id.

6.  The CWA's distinct approach to regulation of "nonpoint sources" should not be seen as an indication that "nonpoint sources" constitute an insignificant source of pollution.  In fact, quite the opposite is true.  As the Ninth Circuit recently observed, nonpoint source pollution from automobile use itself outstrips point source pollution from chemical spills, factories, and sewage plants; indeed, nonpoint source pollution from automobile use is the largest source of water pollution in the United States.  See League of Wilderness Defenders, 309 F.3d at 1184 (citation omitted).

7. There appears to be some dispute between the parties as to whether Mr. Mason was presented as a standing witness in his own right.  In its moving papers, PALCO acknowledges that Mr. Mason was offered as a standing witness. Def's Mot., at 4.  For the purposes of asserting representational standing, EPIC initially identified four of its members who claim to have been adversely affected by PALCO's activities: Cynthia Elkins, Craig Bell, William Eastwood, and Paul Gienger.  See Diveley Decl., Exh. A, at 6.  EPIC subsequently substituted Mr. Mason for Ms. Elkins as a standing witness.  See Diveley Decl., Exh. B. PALCO deposed Mr. Mason concerning his alleged injuries.  See Mason Tr. at 90:13-20. Therefore, it is clear that EPIC can assert standing on the basis of Mr. Mason's own

UNITED STATES DISTRICT COURT
For the Northern District of California

standing.

8. Section 301(a) of the CWA is codified at 33 U.S.C. § 1311 and reads in its entirety as follows:

§ 1311. Effluent limitations
(a) Illegality of pollutant discharges except in compliance with law. Except as in compliance with this section and sections 302, 306, 307, 318, 402, and 404 of this Act [33 USCS §§ 1312, 1316, 1317, 1328, 1342, 1344], the discharge of any pollutant by any person shall be unlawful.

9. In that case, the issue of whether certain devices were point sources was not in dispute. Defendants conceded that the spillway and valve of the dam and reservoir in the dispute were point sources.  And the majority "appear[ed] to agree" with that assertion. Id. at 310 (Fernandez, J., concurring).   Judge Fernandez noted in his concurrence that the devices deemed point sources were in fact the product of remedial efforts aimed at cleaning up acid mine drainage.  Id.

10. Justice Breyer also filed a separate dissent.  Id. at 2266.

11. The EPA urges the court not to follow the Kennedy opinion based on the test set out in Marks v. United States, 430 U.S. 188, 193 (1977): "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as the position taken by those Members who concurred in the judgments on the narrowest grounds."  In its motion to clarify the court's opinion in Healdsburg, the United States urged the Ninth Circuit to interpret Rapanos to provide two alternative standards for CWA jurisdiction. Motion of the United States as Amicus Curiae to clarify the court's opinion, Northern Cal. River Watch v. City of Healdsburg, 457 F.3d 1023 (9th Cir. 2006) (No. 04-15442).  Stipulation of the Parties, Exh. A.

12. While PALCO's papers and the related expert report submitted are not clear, the court assumes that PALCO does not own or otherwise control the land on which certain observations of alleged discharges occurred.  See Def's Opp'n, at 33; Lozeau Dec., Ex.  AA, Charles Rep.  Ex.  D at 1.

13. Section 402(p) of the CWA reads in its entirety:

(p) Municipal and industrial stormwater discharges.
(1) General rule. Prior to October 1, 1994, the Administrator or the State (in the case of a permit program approved under section 402 of this Act [this section]) shall not require a permit under this section for discharges composed entirely of stormwater.
(2) Exceptions. Paragraph (1) shall not apply with respect to the following stormwater discharges:
(A) A discharge with respect to which a permit has been issued under this section before the date of the enactment of this subsection [enacted Feb. 4, 1987].
(B) A discharge associated with industrial activity.
(C) A discharge from a municipal separate storm sewer system serving a population of 250,000 or more.
(D) A discharge from a municipal separate storm sewer system serving a population of 100,000 or more but less than 250,000.

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(E) A discharge for which the Administrator or the State, as the case may be, determines that the stormwater discharge contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States.

(3) Permit requirements.

(A) Industrial discharges. Permits for discharges associated with industrial activity shall meet all applicable provisions of this section and section 301 [33 U.S.C. § 1311]

(B) Municipal discharge. Permits for discharges from municipal storm sewers--

(i) may be issued on a system- or jurisdiction-wide basis;

(ii) shall include a requirement to effectively prohibit non-stormwater discharges into the storm sewers; and

(iii) shall require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, design and engineering methods, and such other provisions as the Administrator or the State determines appropriate for the control of such pollutants.

(4) Permit application requirements.

(A) Industrial and large municipal discharges. Not later than 2 years after the date of the enactment of this subsection [enacted Feb. 4, 1987], the Administrator shall establish regulations setting forth the permit application requirements for stormwater discharges described in paragraphs (2)(B) and (2)(C). Applications for permits for such discharges shall be filed no later than 3 years after such date of enactment [enacted Feb. 4, 1987]. Not later than 4 years after such date of enactment [enacted Feb. 4, 1987], the Administrator or the State, as the case may be, shall issue or deny each such permit. Any such permit shall provide for compliance as expeditiously as practicable, but in no event later than 3 years after the date of issuance of such permit.

(B) Other municipal discharges. Not later than 4 years after the date of the enactment of this subsection [enacted Feb. 4, 1987], the Administrator shall establish regulations setting forth the permit application requirements for stormwater discharges described in paragraph (2)(D). Applications for permits for such discharges shall be filed no later than 5 years after such date of enactment [enacted Feb. 4, 1987]. Not later than 6 years after such date of enactment [enacted Feb. 4, 1987], the Administrator or the State, as the case may be, shall issue or deny each such permit. Any such permit shall provide for compliance as expeditiously as practicable, but in no event later than 3 years after the date of issuance of such permit.

(5) Studies. The Administrator, in consultation with the States, shall conduct a study for the purposes of-

(A) identifying those stormwater discharges or classes of stormwater discharges for which permits are not required pursuant to paragraphs (1) and (2) of this subsection;

(B) determining, to the maximum extent practicable, the nature and extent of pollutants in such discharges; and

(C) establishing procedures and methods to control stormwater discharges to the extent necessary to mitigate impacts on water quality.

Not later than October 1, 1988, the Administrator shall submit to Congress a report on the results of the study described in subparagraphs (A) and (B). Not later than October 1, 1989, the Administrator shall submit to Congress a report on the results of the study described in subparagraph (C).

(6) Regulations. Not later than October 1, 1993, the Administrator, in consultation with State and

local officials, shall issue regulations (based on the results of the studies conducted under paragraph (5)) which designate stormwater discharges, other than those discharges described in paragraph (2), to be regulated to protect water quality and shall establish a comprehensive program to regulate such designated sources. The program shall, at a minimum, (A) establish priorities, (B) establish requirements for State stormwater management programs, and (C) establish expeditious deadlines. The program may include performance standards, guidelines, guidance, and management practices and treatment requirements, as appropriate.

UNITED STATES DISTRICT COURT
For the Northern District of California